Justin **LAYSHOCK**, a minor, by and through his parents; Donald Layshock; Cheryl Layshock, individually and on behalf of their son

v.

**HERMITAGE SCHOOL DISTRICT** Karen Ionta, District Superintendent; Eric W. Trosch, principal Hickory High School CHRIS GILL, Co–Principal Hickory High School, all in their official and individual capacity

**Hermitage School District, Appellant**

Justin **Layshock,** a minor, by and through his parents; Donald Layshock; Cheryl Layshock, individually and on behalf of their son

v.

**Hermitage School District; Karen Ionta, District Superintendent; Eric W. Trosch, principal Hickory High School; Chris Gill, Co–Principal Hickory High School, all in their official and individual capacity**

**Donald Layshock; Cheryl Layshock, Appellants.**

Nos. 07–4465, 07–4555.

United States Court of Appeals, Third Circuit.

Argued: Dec. 10, 2008.

Opinion filed: Feb. 4, 2010.

Rehearing En Banc Granted, Opinion Vacated April 9, 2010.

Anthony G. Sanchez, Esq., (Argued), Christina Lane, Esq., Andrews & Price, Pittsburgh, PA, Attorneys for Appellant/Cross–Appellee, Hermitage School District.

Sean A. Fields, Esq., Associate Counsel, Pennsylvania School Boards Association, Mechanicsburg, PA, Attorney for Amicus Curiae, Pennsylvania School Boards Association, filed in support Appellant/Cross–Appellee, Hermitage School District.

Kim M. Watterson, Esq., Richard T. Ting, Esq., William J. Sheridan, Esq., Reed Smith LLP, Pittsburgh, PA, Witold J. Walczak, Esq., (Argued), Sara J. Rose, Esq., American Civil Liberties Foundation of Pennsylvania, Pittsburgh, PA, Attorneys for Appellees/Cross–Appellants, Donald Layshock, Cheryl Layshock.

John W. Whitehead, Esq., The Rutherford Institute, Charlottesville, VA, Attorney for Amicus Curiae, The Rutherford Institute, in support of Appellees/Cross–Appellants, Donald Layshock, Cheryl Layshock.

Joanna J. Cline, Esq., Brian A. Berkley, Esq., Joshua B. Hirshey, Esq., Emmett M. Hogan, Esq., Pepper Hamilton LLP, Philadelphia, PA, Frank D. Lomonte, Esq., Michael C. Hiestand, Esq., Adam Goldstein, Esq., Arlington, VA, Attorneys for Amicus Curiae, The Student Press Law Center, in support of Appellees/Cross–Appellants, Donald Layshock, Cheryl Layshock.

Robert D. Richards, Esq., Clay Calvert, Esq., University Park, PA, Attorneys for Amicus Curiae, Pennsylvania Center for the First Amendment, in support of Appellees/Cross–Appellants, Donald Layshock, Cheryl Layshock.

Before: McKEE, SMITH and ROTH, Circuit Judges.

## OPINION

McKEE, Circuit Judge.

In this appeal and cross-appeal, we are asked to determine if a school district can punish a student for expressive conduct that originated outside of the classroom, when that conduct did not disturb the school environment and was not related to any school sponsored event. We are also asked to determine the extent to which

this school district's response to a student posting on the internet interfered with the substantive due process rights of the student's parents.

It all began when Justin Layshock used his grandmother's computer to access a popular social networking internet web site where he created a fake internet "profile" of his high school principal, Eric Trosch. His parents filed this action under 42 U.S.C. § 1983, after the School District punished Justin for that conduct. The suit alleges, *inter alia*, that the District's punishment violated Justin's First Amendment rights of expression and the parents' Fourteenth Amendment substantive due process rights in the care and nurturing of their son. The district court granted summary judgment in favor of Justin on his First Amendment claim, but ruled in favor of the School District on his parents' due process claim. For the reasons that follow, we will affirm the district court.

## I. FACTUAL BACKGROUND

In December of 2005, Justin Layshock was a seventeen-year old senior at Hickory High School which is part of the Hermitage School District in Hermitage, Pennsylvania. Sometime between December 10 and 14, 2005, while Justin was at his grandmother's house during non-school hours, he used her computer to create what he would later refer to as a "parody profile" of his principal, Eric Trosch. The only school resource that was even arguably involved in creating the profile was a photograph of Trosch that Justin copied

from the school district's website. Justin copied that picture with a simple "cut and paste" operation using the computer's internet browser and mouse. Justin created the profile on "MySpace."[1] MySpace is a popular social-networking website that "allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests." *Doe v. MySpace, Inc.*, 474 F.Supp.2d 843, 845 (W.D.Tex.2007).[2]

Justin created the profile by giving bogus answers to survey questions taken from various templates that were designed to assist in creating an online profile. The survey included questions about favorite shoes, weaknesses, fears, one's idea of a "perfect pizza," bedtime, etc. All of Justin's answers were based on a theme of "big," because Trosch is apparently a large man. For example, Justin answered the "tell me about yourself" questions as follows:

> Birthday: too drunk to remember
>
> Are you a health freak: big steroid freak
>
> In the past month have you smoked: big blunt[3]
>
> In the past month have you been on pills: big pills
>
> In the past month have you gone Skinny Dipping: big lake, not big dick
>
> In the past month have you Stolen Anything: big keg
>
> Ever been drunk: big number of times
>
> Ever been called a Tease: big whore

---

1. MySpace is found at: http://www.myspace.com.

2. Social online networking sites allow members to use "their online profiles to become part of an online community of people with common interests. Once a member has created a profile, she can extend 'friend invita-

tions' to other members and communicate with her friends over the MySpace.com platform via e-mail, instant messaging, or blogs." *Doe*, 474 F.Supp.2d at 846.

3. Justin explained that a "blunt" was a marijuana cigarette.

Ever been Beaten up: big fag

Ever Shoplifted: big bag of kmart

Number of Drugs I have taken: big

Under "Interests," Justin listed: "Transgender, Appreciators of Alcoholic Beverages." Justin also listed "Steroids International" as a club Trosch belonged to.

Justin afforded access to the profile to other students in the District by listing them as "friends" on the MySpace website, thus allowing them to view the profile. Not surprisingly, word of the profile "spread like wildfire" and soon reached most, if not all, of Hickory High's student body.[4]

During mid-December 2005, three other students also posted unflattering profiles of Trosch on MySpace. Each of those profiles was more vulgar and more offensive than Justin's. Trosch first learned about one of the other profiles from his daughter who was in eleventh grade. On Monday, December 12, 2005, Trosch told Co–Principal Chris Gill and District Superintendent Karen Ionta about this other profile and asked Technology Director Frank Gingras to disable it. However, despite the administration's best efforts, students found ways to access the profiles. Trosch discovered Justin's profile on Thursday evening, December 15, and a fourth profile on Sunday, December 18.

Trosch believed all of the profiles were "degrading," "demeaning," "demoralizing," and "shocking." He was also concerned about his reputation and complained to the local police. Although he was not concerned for his safety, he was interested in pressing charges against those responsible for the bogus profiles, and he discussed whether the first profile he discovered might constitute harassment, defamation, or slander. However, no criminal charges were ever filed against Justin or any of the other student authors of profiles.

On December 15, Justin used a computer in his Spanish classroom to access his MySpace profile of Trosch. He also showed it to other classmates, although he did not acknowledge his authorship. After viewing the profile, the students logged off of MySpace. Justin again attempted to access the profile from school on December 16, purportedly to delete it. School district administrators were unaware of Justin's in-school attempts to access MySpace until their investigation the following week. Teacher Craig Antush glimpsed the profile in his computer lab class and told the students who were congregating around a computer and giggling to shut it down.

The school district administrators were not able to totally block students from visiting the MySpace web page at school because Gingras, the Technology Coordinator, was on vacation on the 16th. Instead, student use of computers was limited to labs or the library where it could be supervised. School officials continued to limit computer use from December 16 until December 21, which was the last day of school before Christmas recess, and computer programming classes were cancelled.

According to the district court, the school district's investigation revealed how many students had accessed MySpace before access to the site at school was disabled, but the school could not determine how many students actually accessed any of the Trosch profiles, or which Trosch profiles had been viewed while a student was on the MySpace website.

**4.** Justin later explained that he made the profile to be funny, and did not intend to hurt anyone. However, there was obviously nothing "funny" about the profile in the eyes of the school administration.

School district officials first learned that Justin might have created one of the Trosch profiles on December 21. On that day, Justin and his mother were summoned to a meeting with Superintendent Ionta and Co–Principal Gill. During that meeting, Justin admitted to creating a profile, but no disciplinary action was then taken against him. After the meeting, without prompting from anyone, Justin went to Trosch's office and apologized for creating the profile.[5]

Justin's parents were understandably upset over Justin's behavior. They discussed the matter with him, expressed their extreme disappointment, "grounded" him, and prohibited him from using their home computer.

On January 3, 2006, the school district sent a letter to Justin and his parents giving them notice of an informal hearing that was to be held. The letter read, in pertinent part as follows:

> Justin admitted prior to the informal hearing that he created a profile about Mr. Trosch.
>
> This infraction is a violation of the Hermitage School District Discipline Code: Disruption of the normal school process; Disrespect; Harassment of a school administrator via computer/internet with remarks that have demeaning implications; Gross misbehavior; Obscene, vulgar and profane language; Computer

Policy violations (use of school pictures without authorization).

The school district subsequently found Justin guilty of all of those charges.

In addition to a ten-day, out-of-school suspension; Justin's punishment consisted of (1) being placed in the Alternative Education Program (the "ACE" program) at the high school for the remainder of the 2005–2006 school year;[6] (2) being banned from all extracurricular activities, including Academic Games and foreign-language tutoring;[7] and (3) not being allowed to participate in his graduation ceremony.[8] The Layshocks were also informed that the district was considering expelling Justin. Ironically, Justin, who created the least vulgar and offensive profile, and who was the only student to apologize for his behavior, was also the only student punished for the MySpace profiles.

## II. DISTRICT COURT PROCEEDINGS.

The Layshocks initiated this action on January 27, 2006, by filing a three count complaint pursuant to 42 U.S.C. § 1983 individually, and on Justin's behalf, against the Hermitage School District, Karen Ionta, Eric Trosch, and Chris Gill, in their official and individual capacities (hereinafter collectively referred to as the "School District" or "District"). The Layshocks also filed a motion for a temporary re-

---

**5.** Trosch later testified that he found Justin's apology respectful and sincere. Justin followed up with a written letter of apology on January 4, 2006.

**6.** Students assigned to ACE meet in a segregated area of the high school for three hours each day. The program is typically reserved for students with behavior and attendance problems who are unable to function in a regular classroom.

Prior to creating the Myspace profile, Justin was classified as a gifted student, was

enrolled in advance placement classes, and had won awards at interscholastic academic competitions. The record does not reveal how the school district determined that it was appropriate to place such a student in a program designed for students who could not function in a classroom.

**7.** Justin had been a French tutor to middle school students.

**8.** Justin did graduate in 2006 and went on to attend a university in New York City.

straining order and/or preliminary injunction. Count I of the complaint alleged that the District's punishment of Justin violated his rights under the First Amendment. Count II alleged that the District's policies and rules were unconstitutionally vague and/or overbroad, both on their face and as applied to Justin. Count III alleged that the District's punishment of Justin interfered with the Layshocks' parental right of determining how best to raise, nurture, discipline and educate their child.

The district court denied the request for a temporary restraining order, *Layshock v. Hermitage Sch. Dist.*, 412 F.Supp.2d 502, 508 (W.D.Pa.2006), and the Layshocks withdrew their motion for a preliminary injunction pursuant to the district court's efforts at mediation.[9] On March 31, 2006, the district court denied the District's motion to dismiss the Layshocks' claim. The court ruled that the parents may assert a claim for a violation of their own due process right to "raise, nurture, discipline and educate their children" based on a school district's punishment of their child for speech the child uttered in the family home.

After discovery, both sides moved for summary judgment, and the court thereafter entered summary judgment in favor of Justin and against the School District only on the First Amendment claim.[10] The court concluded that a jury trial was necessary to determine compensatory damages and attorneys' fees. *See* id. at 507.

Thereafter, the district court denied the District's motion for entry of judgment pursuant to Fed.R.Civ.P. 54(b) or, in the alternative, for the issuance of a certificate of appealability pursuant to 28 U.S.C. § 1292(b).

The parties subsequently filed a joint motion in which they stipulated to damages and requested entry of final judgment while preserving all appellate issues pertaining to liability. The district court then entered a consent judgment, and this appeal and cross-appeal followed. The School District appeals the district court's entry of summary judgment in Justin's favor on his First Amendment claims (No. 07–4465), and the Layshock parents cross-appeal the district court's entry of summary judgment against them on their Fourteenth Amendment due process claims (No. 07–4555).

### III. STANDARD OF REVIEW.

"Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bjorgung v. Whitetail Resort, LP,* 550 F.3d 263, 268 (3d Cir.2008) (citation and internal quotations omitted). In ruling on a motion for summary judgment, the district court must view the facts in the light most favorable to the non-moving party. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d

---

**9.** The Layshocks agreed to withdraw their motion for a preliminary injunction in exchange for the District's agreement to remove Justin from the ACE program, reinstate him to his regular classes, allow him to participate in Academic Games and attend his graduation.

**10.** The court ruled that Trosch was entitled to summary judgment on all counts because he

was not involved disciplining Justin. It also held that Ionta and Gill were entitled to summary judgment on Justin's First Amendment claim based on qualified immunity, and that all of the defendants were entitled to summary judgment on the vagueness/overbreadth challenge and the parents' substantive due process claims.

Cir.2000). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As our review of a grant of summary judgment is plenary, we operate under the same legal standards as the District Court." *Bjorgung*, 550 F.3d at 268.

## IV. DISCUSSION

### A. The School District's Appeal (No. 07–4465).

#### 1. The First Amendment's Application in Public Schools.

In the landmark case of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), a group of high school students decided to wear black arm bands to school to protest the war in Vietnam. When school officials learned of the planned protest, they preemptively prohibited students from wearing armbands, and several students who ignored the ban and wore armbands to school anyway were suspended. *Id.* at 504, 89 S.Ct. 733. Those students then brought an action through their parents under 42 U.S.C. § 1983, alleging that their First Amendment rights had been violated. The district court rejected that claim and upheld the constitutionality of the school officials' action finding that it had been reasonable to prevent disturbance of school discipline. *Id.* 504–505, 89 S.Ct. 733. The district court's decision was affirmed without opinion by an equally divided court of appeals sitting *en banc*. *Id.* at 505, 89 S.Ct. 733.

The Supreme Court ultimately held that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Id.* at 513, 89 S.Ct. 733. The Court concluded that the students before it were doing nothing more than engaging in political speech, and wearing armbands to express "their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Id.* at 514, 89 S.Ct. 733. The school district's only interest in banning the speech had been the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" or "an urgent wish to avoid the controversy which might result from the expression." *Id.* at 509–10, 89 S.Ct. 733. The Court held that that interest was not enough to justify banning "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.* at 508, 89 S.Ct. 733. In one of its most famous passages, the Court explained:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

*Id.* at 506, 89 S.Ct. 733.

Although the Court concluded that the First Amendment did reach inside the "schoolhouse gate," it also recognized that the unique nature of the school environment had to be part of any First Amendment inquiry. The Court explained that it "ha[d] repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. 733.

The Court next addressed the scope of the First Amendment in the con-

text of student speech in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). There, the Court upheld the school's suspension of a high school student for delivering a nominating speech at a school assembly using "an elaborate, graphic, and explicit sexual metaphor." *Id.* at 678, 106 S.Ct. 3159. The Court explained:

> [t]he schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by [Fraser].[11]

*Id.* at 683, 106 S.Ct. 3159. In reaching this conclusion, the Court distinguished its prior holding in *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). There, the Court had struck down an adult's conviction for disorderly conduct based on his having worn a jacket in a courthouse that bore an obscenity pertaining to the draft. The *Fraser* Court explained:

> [i]t does not follow ... that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in public school.... [T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.

*Id.* at 682, 106 S.Ct. 3159 (citation and internal quotation marks omitted). The Court concluded that the school could punish Fraser for his offensive nominating speech during a school assembly because the First Amendment does not prevent schools from encouraging the "fundamen-

tal values of 'habits and manners of civility'" *id.* at 681, 106 S.Ct. 3159, by "insisting that certain modes of expression are inappropriate and subject to sanctions." *Id.* at 683, 106 S.Ct. 3159. Thus, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id.*

Similarly, in *Hazelwood School District. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court held that a principal's deletion of student articles on teen pregnancy from a school-sponsored newspaper did not violate the First Amendment. The Court distinguished *Tinker* by noting that since the school had not opened the newspaper up as a public forum in the case before it, the school could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562. The Court explained:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored ... expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.... Educators are entitled to ex-

---

**11.** In *Saxe v. State College Area School District*, 240 F.3d 200, 213 (3d Cir.2001), we interpreted *Fraser* as establishing that "there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech in school."

ercise greater control over this second form of student expression.

*Id.* at 270–71, 108 S.Ct. 562.

The extent to which First Amendment protections apply in the public school context was most recently addressed in *Morse v. Frederick*, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). There, at a school-sanctioned and school-supervised event, a high school principal [Morse] saw some of her students unfurl a large banner conveying a message she reasonably regarded as promoting illegal drug use. *Id.* at 396, 127 S.Ct. 2618. The banner read: "BONG HiTS 4 JESUS." *Id.* at 397, 127 S.Ct. 2618. "Consistent with established school policy prohibiting such messages at school events, [Morse] directed the students to take down the banner." *Id.* at 396, 127 S.Ct. 2618. Frederick, one of the students who brought the banner to the event, refused to remove it, and Morse "confiscated the banner and later suspended [Frederick]." *Id.* Frederick sued Morse and the school district pursuant to 42 U.S.C. § 1983, alleging a violation of his First Amendment right of expression. The district court granted summary judgment to the school district and Morse, holding that they were entitled to qualified immunity and that they had not infringed Frederick's First Amendment rights. *Id.* at 399, 127 S.Ct. 2618. The Court of Appeals for the Ninth Circuit reversed.

■ The Supreme Court granted *certiorari* to determine "whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages." *Id.* at 400, 127 S.Ct. 2618.[12] The Court "resolve[d] the first question against Frederick," and, therefore, did not have to reach the sec-

ond. *Id.* The Court explained that its Fourth Amendment jurisprudence recognized that "deterring drug use by schoolchildren is an important—indeed, perhaps compelling interest." *Id.* at 407, 127 S.Ct. 2618 (citation omitted). The "special characteristics of the school environment, and the governmental interest in stopping student drug abuse allow schools to restrict student expression that they reasonably regard as promoting such abuse." *Id.* at 408, 127 S.Ct. 2618. Thus, "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 402, 127 S.Ct. 2618. The Court rejected Frederick's claim that since he was across the street from the school and not on school property, he was not inside *Tinker*'s "schoolhouse gate," and school officials therefore had lost authority over him. The Court reasoned that the event where the banner was unfurled occurred during school hours, and it had been approved by the school's principal as a school event. *Id.* at 400, 127 S.Ct. 2618. School events and field trips off school grounds were subject to the school's rules for student conduct. *Id.* at 400–01, 127 S.Ct. 2618.

It is against this legal backdrop that we must determine whether the District's actions here violated Justin's First Amendment rights, and whether the District's actions violated the substantive due process rights afforded his parents under the Fourteenth Amendment.

At the outset, it is important to note that the district court found that the District could not "establish[ ] a sufficient nexus between Justin's speech and a substantial disruption of the school environment[,]"

---

12. The court of appeals had ruled that the principal was not entitled to qualified immu-

nity.

*Layshock,* 496 F.Supp.2d at 600, and the School District's does not challenge that finding on appeal. Rather, the District argument is twofold. The District argues that:

> a sufficient nexus exists between Justin's creation and distribution of the vulgar and defamatory profile of Principal Trosch and the School District to permit the School District to regulate this conduct. The "speech" initially began on-campus: Justin entered school property, the School District web site, and misappropriated a picture of the Principal. The "speech" was aimed at the School District community and the Principal and was accessed on campus by Justin. It was reasonably foreseeable that the profile would come to the attention of the School district and the Principal.

District's Br. at 9.

### 2. Justin's "Entry" Onto the District's Web Site.

██ The School District's attempt to forge a nexus between the school and Justin's profile by relying upon his "entering" the District's web site to "take" the District's photo of Trosch is unpersuasive at best. The argument equates Justin's act of signing onto a web site with the kind of trespass he would have committed had he broken into the principal's office or a teacher's desk; and we reject it. *See Thomas v. Board of Educ.,* 607 F.2d 1043 (2d Cir.1979).

We find the reasoning in *Thomas v. Board of Education,* 607 F.2d 1043 (2d Cir.1979), far more persuasive.[13] *Thomas* involved a group of students who were suspended for producing "a satirical publi-

cation addressed to the school community." *Id.* at 1045. The articles included such topics as masturbation and prostitution, as well as more standard fare such as "school lunches, cheerleaders, classmates, and teachers." *Id.* "Some of the initial preparation for publication occurred after school hours in the classroom" of a teacher whom the students consulted "for advice on isolated questions of grammar and content." *Id.* In addition, "an occasional article was composed or typed within the school building, always after classes," and the finished magazine was stored in a "classroom closet" with the classroom teacher's permission. *Id.*

However, the students were very careful to distribute the periodical only after school and off campus, and the vast majority of their work on the publication was done "in their homes, off campus and after school hours." *Id.* The school principal learned of the magazine when a teacher confiscated a copy from another student on campus, and "following consultation with the Board of Education," the principal imposed penalties that included: a five-day suspension of the students involved.[14] The punishment was based on the students' publication of "an allegedly 'morally offensive, indecent, and obscene,' tabloid." *Id.* at 1050 n. 12.

The students brought a suit under 42 U.S.C. § 1983 against the school board and other school officials "seeking injunctive and declaratory relief from alleged deprivations of their First and Fourteenth Amendment rights." *Id.* at 1046. The district court denied the students' request for injunctive relief based upon its conclu-

---

13. *Thomas* was decided after *Tinker* but before *Fraser.*

14. The principal and Superintendent of Schools had initially decided to take no action pending assessment of the publication's im-

pact. However, they ultimately decided to act after being contacted by the President of the Board of Education. *Thomas,* 607 F.2d at 1045–46.

sion that the publication "was potentially destructive of discipline in [the school], and therefore not protected by the First Amendment." *Id.* at 1047.

The Court of Appeals for the Second Circuit concluded that the students' conduct was not sufficiently related to the school to justify the school's exercise of authority. The court explained:

> [A]ll but an insignificant amount of relevant activity in this case was deliberately designed to take place beyond the schoolhouse gate. Indeed, the [students] diligently labored to ensure that [the magazine] was printed outside the school, and that no copies were sold on school grounds. That a few articles were transcribed on school typewriters, and that the finished product was secretly and unobtrusively stored in a teacher's closet do not alter the fact that [the magazine] was conceived, executed, and distributed outside the school. At best, therefore, any activity within the school itself was De minimis.

*Id.* at 1050.

The court reached that conclusion even though the students there actually stored the offending publication inside a classroom and did some minimal amount of work on the periodical in school using school resources. Here, the relationship between Justin's conduct and the school is far more attenuated than in *Thomas*, and we will not allow the School District to stretch its authority so far that it reaches Justin while he is sitting in his grandmother's home after school.

We realize, of course, that it is now well established that *Tinker's* "schoolhouse gate" is not constructed solely of the bricks and mortar surrounding the school yard. Nevertheless, the reach of school authorities is not without limits. In *Morse*, the Court held that the First Amendment does not prevent a principal from "restrict[ing] student speech *at a school event*, when that speech is reasonably viewed as promoting illegal drug use." 551 U.S. at 403, 127 S.Ct. 2618 (emphasis added). Nevertheless, the Court was careful to note that "[h]ad [the student] delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 404, 127 S.Ct. 2618.

It would be an unseemly and dangerous precedent to allow the state in the guise of school authorities to reach into a child's home and control his/her actions there to the same extent that they can control that child when he/she participates in school sponsored activities. Allowing the District to punish Justin for conduct he engaged in using his grandmother's computer while at his grandmother's house would create just such a precedent and we therefore conclude that the district court correctly ruled that the District's response to Justin's expressive conduct violated the First Amendment guarantee of free expression.

### 3. The District Can Not Punish Justin Merely Because His Speech Reached Inside the School.

As noted above, the School District also claims that Justin's speech can be treated as "on-campus" speech because it "was aimed at the School District community and the Principal and was accessed on campus by Justin [and][i]t was reasonably foreseeable that the profile would come to the attention of the School District and the Principal."

The district court held that the School District's punishment of Justin was not appropriate under *Fraser* because "[t]here is no evidence that Justin engaged in any lewd or profane speech while in school." *Layshock*, 496 F.Supp.2d at 599–600. It also held that Justin's punishment was not

appropriate under *Tinker* because the School District did "not establish[ ] a sufficient nexus between Justin's speech and a substantial disruption of the school environment." *Id.* at 600.

The School District does not dispute the district court's finding that its punishment of Justin was not appropriate under *Tinker*. However, it rests its argument on the Supreme Court's analysis in *Fraser*. In the School District's view, Justin's speech—his MySpace profile of Trosch—was unquestionably vulgar, lewd and offensive, and therefore not shielded by the First Amendment because it ended up inside the school community.[15] Similarly, the School District argues that under our decision in *Saxe, see* n. 11, *supra*, there is no First Amendment protection for lewd, vulgar, indecent or plainly offensive speech in schools.[16]

The District rests this argument primarily on three cases which it claims allow it to respond to a student's vulgar speech when that speech is posted on the internet. The District cites *J.S. v. Bethlehem Area Sch. Dist.*, 569 Pa. 638, 807 A.2d 847 (2002); *Wisniewski v. Bd. of Educ. of Weedsport Central Sch. Dist.*, 494 F.3d 34 (2d Cir.2007); and *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir.2008). However, as we

will explain, each of those cases involved off campus expressive conduct that resulted in a substantial disruption of the school, and the courts allowed the schools to respond to the substantial disruption that the student's out of school conduct caused.

In *J.S.*, an eighth grade student created a threatening web site aimed at his algebra teacher that went so far as to explain "[w]hy Should She Die," and requested money to "to help pay for the hitman." 807 A.2d at 851. The site frightened several students and parents and the algebra teacher was so badly frightened that she ended up having to take medical leave from her teaching responsibilities. As a result of her inability to return to teaching, "three substitute teachers were required to be utilized which disrupted the educational process of the students." *Id.*, at 852. "In sum, the web site created disorder and significantly and adversely impacted the delivery of instruction." *Id.*, at 869. The Supreme Court of Pennsylvania concluded that the resulting disruption of instruction and the educational environment allowed the school to punish the student for his expressive conduct even though the student created the web site from his home.[17]

---

**15.** The District's argument in this regard is not crystal clear as its brief suggests that it can react to Justin's profile merely because it was lewd and vulgar. For example, the District summarizes one of its arguments as follows:

> The School District did not violate the First Amendment by punishing Justin for engaging in conduct which interfered with the School District's "highly appropriate function ... to prohibit the use of vulgar and offense terms in public discourse."

District's Br. at 10 (ellipsis in original).

However, we reject out of hand any suggestion that schools can police students' out-of-school speech by patrolling "the public discourse." Accordingly, we will assume that the District is arguing that it can control lewd and vulgar speech as authorized under *Fraser*.

**16.** In *Saxe*, we did state: "Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language." 240 F.3d at 214. However, when read in context, it is clear that we were there referring only to in school speech. Thus, we summarized the holding in *Fraser* as follows: "[a]ccording to *Fraser*, ... there is no First Amendment protection for 'lewd,' 'vulgar,' indecent,' and 'plainly offensive' speech *in school*." *Id.*, at 213 (emphasis added).

**17.** The district court believed that *J.S.* was "on point" but "respectfully reache[d] a slightly different balance between student expression and school authority." *Layshock*, 496 F.Supp.2d at 602. However, we do not think *J.S.* is "on point" or the least bit helpful

Similarly, the school suspended the student in *Wisniewski,* for creating an image on the internet from his home computer that depicted a pistol firing a bullet at a teacher's head with dots representing splattered blood above the head. 494 F.3d at 36. The words: "Kill Mr. VanderMolen" were printed beneath the drawing. VanderMolen was the student's English teacher. The student created the image a couple of weeks after his class was instructed that threats would not be tolerated at the school, and would be treated as acts of violence. The court of appeals affirmed the district court's grant of summary judgment in favor of the school district in a suit alleging a violation of the First Amendment based on the school's suspension of the student for the out of school conduct. The court reasoned that "[t]he fact that [the student's] creation and transmission of the icon occurred away from school property [did] not necessarily insulate him from school discipline." 494 F.3d at 39. The court reasoned that "even if [the student's] transmission of an [image] depicting and calling for the killing of his teacher could be viewed as an expression of opinion within the meaning of *Tinker,*" it was not protected by the First Amendment because "it cross[ed] the boundary of protected speech and pose[d] a reasonably foreseeable risk [of] materially and substantially disrupting the work and discipline of the school". *Id.,* at 38–9 (internal quotation marks omitted).

Finally, in *Doninger,* a student who was a class officer posted a message on her publicly accessible web log or blog [18] that resulted in school authorities not allowing her to participate in an election for class office. *Id.* at 43. In her message, she complained about a school activity that was cancelled "due to douchebags in central office," and encouraged others to contact the central office to "piss [the district superintendent] off more." *Id.* at 45. When the principal learned of the student's posting, she prohibited her from running for senior class secretary "because [the student's] conduct had failed to display the civility and good citizenship expected of class officers." *Id.,* at 46. The student and her parents then sought injunctive relief in the form of a court order allowing her to run for class office. The court of appeals affirmed the district court's denial of relief because the student's out of school expressive conduct "created a foreseeable risk of substantial disruption to the work and discipline of the school." *Id.* at 53.[19] "[The student] herself testified that … students were 'all riled up' and that a sit-in was threatened." *Id.* at 51. Accordingly, the court of appeals held that the student's mother "failed to show clearly that [the student's] First Amendment rights were violated when she was disqualified from running" for class office. *Id.* at 53.

However, for our purposes, it is particularly important to note that the court in *Doninger* was careful to explain that it "[had] no occasion to consider whether a different, more serious consequence than disqualification from student office would

---

because there is no comparison between the impact of the conduct there and the impact of the conduct here.

18. "A blog (a contraction of the term 'web log') is a type of website, usually maintained by an individual with regular entries or commentary, descriptions of events, or other material such as graphics or video…. 'Blog' can also be used as a verb, *meaning to main-* *tain or add content to a blog."* (http://en. wikipedia.org/wiki/Blog) (last visited November 19, 2009).

19. The blog had resulted in numerous calls and emails to the principal, and the court of appeals noted that the blog also used inaccurate and misleading information to rally those who read it to contact the school principal.

raise constitutional concerns." *Id.* at 53. Of course, Justin's consequences were more serious; he was suspended. Moreover, in citing *Doninger*, we do not suggest that we agree with that court's conclusion that the student's out of school expressive conduct was not protected by the First Amendment there. Rather, we cite *Doninger* only to respond to the School District's contention that that case supports its actions against Justin here.

██ As noted earlier, the District's January letter to the Layshocks advising them of Justin's suspension reads, in relevant part, that it was punishing Justin because: "Justin admitted prior to the informal hearing that he created a profile about Mr. Trosch." Although the letter also mentions disruption, the District does not now challenge the district court's finding that Justin's conduct did not result in any substantial disruption. Moreover, when pressed at oral argument, counsel for the School District conceded that the District was relying solely on the fact that Justin created the profile of Trosch. We have found no authority that would support punishment for creating such a profile unless it results in foreseeable and substantial disruption of school.

We believe the cases relied upon for the District stand for nothing more than the proposition that schools may punish expressive conduct that occurs outside of school as if it occurred inside the "schoolhouse gate," under certain very limited circumstances, none of which are present here.

As the court of appeals explained in *Thomas*: "[O]ur willingness to defer to the schoolmaster's expertise in administering school discipline rests, in large measure, upon the supposition that the arm of authority does not reach beyond the schoolhouse gate." 607 F.2d at 1045. We need not now define the precise parameters of when the arm of authority can reach beyond the schoolhouse gate because, as we noted earlier, the district court found that Justin's conduct did not disrupt the school, and the District does not appeal that finding. Thus, we need only hold that Justin's use of the District's web site does not constitute entering the school, and that the District is not empowered to punish his out of school expressive conduct under the circumstances here.

Based on those two conclusions, we will affirm the district court's grant of summary judgment to Justin on his First Amendment Claim.[20]

### B. The Layshock Parents' Appeal (No. 07–4555).

As noted, earlier, in Count III of the complaint, Justin's parents alleged that the District's punishment of Justin for conduct he engaged in in his grandmother's home interfered with their right to determine how to best raise, nurture, discipline and educate their children. As also noted, the district court granted summary judgment to the District on that claim. The parents stated in their depositions that they brought their Due Process claim because they did not believe that the District had a right to punish Justin for creating the profile outside of school. The district court did not believe the parents had explained how the District's punishment of

---

**20.** The District argues in the alternative that it did not violate the First Amendment by punishing Justin because his speech was defamatory and not protected by the First Amendment. The Layshocks respond by arguing that Justin's profile is a parody that cannot constitute defamation. However, whether or not we accept the characterization of a "parody," the issue before us is limited to whether the District had the authority to punish Justin for expressive conduct outside of school that the District considered lewd and offensive.

Justin interfered with their ability to discipline their son. The court therefore concluded that the parental claim the parents were asserting was merely "duplicative of Justin's First Amendment claim," *Layshock*, 496 F.Supp.2d at 606, and not an independent claim of their own.

■ The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The Due Process Clause "guarantees more than fair process," it also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (citations and internal quotation marks omitted). Indeed, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 67, 120 S.Ct. 2054. In fact, "the interest of parents in the care, custody, and control of their children [ ] is perhaps one of the most fundamental liberty interests recognized" by the Supreme Court. *Id.* at 65, 120 S.Ct. 2054. Thus, "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

■ However, in *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir.2005), we noted that "[t]he Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education," and those boundaries remain undefined.

Nevertheless, despite the rather ambiguous nature of those boundaries, we agree that the parents have not shown how the School District's action in any way interfered with their ability to control Justin's "upbringing [or] education." Although we can envision situations where a school's reaction to a student's conduct could interfere with the parents' ability to exercise appropriate control and authority over their child and his/her upbringing and education, nothing on this record would support such a finding here. Here the parental assertion of a due process violation is based on nothing more than the parents' conclusory allegations of interference. They rest their claim on these assertions even though it appears that they were able to take the action they thought necessary to communicate their displeasure with their son's actions and the inappropriateness of his behavior. We therefore fail to see how the school's inappropriate response to Justin's actions in any way interfered with the Layshocks' liberty interest in raising their son.

■ Accordingly, although a child's constitutional rights will not always be coterminous with his/her parents' liberty interest, we believe the district court correctly concluded that the Layshocks have not shown how their liberty interest was infringed by the School District's violation of their son's First Amendment right of expression.

## V. CONCLUSION

For the reasons we have set forth above, we will affirm the district court's grant of summary judgment to Justin on his First Amendment claim and the district court's grant of summary judgment to the District on Justin's parents' Fourteenth Amend-

ment Claim.[21]

---

**21.** The School District makes several other arguments in response to both the First Amendment claim, and the parents' substantive due process claim. However, we conclude that they are without merit and do not warrant further discussion given our analysis of the First Amendment claim.