**J.S., a minor, through her parents; Terry SNYDER; Steven Snyder, Appellants**

v.

**BLUE MOUNTAIN SCHOOL DISTRICT; Joyce Romberger; James McGonigle.**

No. 08–4138.

United States Court of Appeals, Third Circuit.

Argued June 2, 2009.

Filed: Feb. 4, 2010.

Rehearing En Banc Granted, Opinion Vacated April 9, 2010.

---

Mary E. Kohart, Aliceson K. Littman, Tara S. Sarosiek, Drinker, Biddle & Reath, Philadelphia, PA, Mary Catherine Roper (Argued), American Civil Liberties Union of Pennsylvania, Philadelphia, PA, Witold J. Walczak, American Civil Liberties Union, Pittsburgh, PA, for Appellants.

Jonathan P. Riba (Argued), Sweet, Stevens, Katz & Williams, New Britain, PA, for Appellees.

Robert D. Richards, Penn State University, University Park, PA, for Amicus Appellant.

Before FISHER and CHAGARES, Circuit Judges, and DIAMOND,* District Judge.

## OPINION OF THE COURT

FISHER, Circuit Judge.

This appeal presents a challenge to J.S.'s suspension from Blue Mountain Middle School after she created from her home computer a MySpace.com Internet profile featuring her principal, James McGonigle. The profile did not state McGonigle's name, but included his photo-graph from the website of Blue Mountain School District (the "School District"), as well as profanity-laced statements insinuating that he was a sex addict and pedophile. On appeal, J.S. and her parents assert that the District Court erred in granting summary judgment in favor of the School District, arguing that the School District violated J.S.'s First Amendment free speech rights by punishing her for creating the profile; the School District violated J.S.'s parents' fundamental right to direct the upbringing of their child by regulating her out-of-school conduct; Pennsylvania law does not permit school districts to discipline students for out-of-school conduct; and the School District's disciplinary and computer-use policies were unconstitutionally vague and overbroad. Because we believe school authorities could reasonably have forecasted a substantial disruption of or material interference with the school as a result of the MySpace profile, as defined by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), we conclude that the School District did not violate J.S.'s First Amendment free speech rights by disciplining her for creating the profile. We also reject J.S.'s additional arguments and, therefore, we will affirm.

## I.

### A. Factual History

In Spring 2007, J.S. was a fourteen-year-old eighth grader at Blue Mountain Middle School (the "Middle School") in Orwigsburg, Pennsylvania, where she lived with her two parents, Terry and Steven Snyder (the "Snyders"). She was an honor roll student and had faced discipline at

---

* Honorable Paul S. Diamond, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

school only in the form of two or three dress code violations, the most recent of which occurred on February 20, 2007.

On Sunday, March 18, 2007, J.S. and her friend K.L., another eighth grader at the Middle School, created a fictitious profile on MySpace.com from J.S.'s house using a computer belonging to J.S.'s parents.[1] The profile's direct URL was http://www.myspace.com/kidsrockmybed. Although J.S. and K.L. were at their respective houses, the two girls communicated over AOL Instant Messenger, and took turns adding to the profile from their separate locations. The profile featured McGonigle's photograph, which the students had copied and pasted from the website of Blue Mountain School District (the "School District"). The profile did not identify McGonigle by name, school, or location, but instead created the page to appear to be a self-portrayal of a middle school principal named "m-hoe=]." The profile's owner described himself as a married bisexual forty-year-old man, a Virgo, and a "[p]roud parent" who lived in Alabama with his wife and child. His "Interests" section read as follows:

General detention. being a tight ass. riding the fraintrain.[2] spending time with my child (who looks like a gorilla). baseball.my golden pen. fucking in my office. hitting on students and their parents.

Music i love all kinds. favorite is techno.

Television almost anything. i mainly watch—the playboy channel on directv. OH YEAH BITCH!

Heroes myself. ofcourse.

(App. at 38 (all text and formatting as in original).) Another section, entitled "About me," stated:

HELLO CHILDREN

yes. it's your oh so wonderful, hairy, expressionless,

sex addict, fagass, put on this world with a small dick

PRINCIPAL

I have come to myspace so i can pervert the minds of other

principal's to be just like me. I know, I know, you're all

thrilled

Another reason I came to my space is because–I am

keeping an eye on you students (who i care for so much)

For those who want to be my friend, and aren't in my school

I love children, sex (any kind), dogs, long walks on the

beach, tv, being a dick head, and last but not least my

darling wife who looks like a man (who satisfies my needs)

MY FRAINTRAIN

so please, feel free to add me, message me whatever

*Id.* (all text and formatting as in original). J.S. testified before the District Court at a

---

1. MySpace.com is "a social networking platform that allows Members to create unique personal profiles online in order to find and communicate with old and new friends." Terms & Conditions, MySpace.com, http://www.myspace.com/index.cfm?fuseaction=misc.terms (last visited Aug. 17, 2009).

2. This appears to be a reference to McGonigle's wife, Debra Frain, a guidance counselor at the Middle School. Also, next to McGonigle's picture on the profile is a quote that reads as follows: "fraintrain- it's a slow ride but you'll get there eventually." (App. at 38.)

preliminary injunction hearing that she created this profile because she was "mad" at McGonigle due to the way he treated her during her February 20, 2007 dress code violation, stating that she believed he handled the situation inappropriately and yelled at her unnecessarily, and that the profile was simply a joke between her and her friends. She stated that she included in the profile things she had heard other students say about McGonigle. At her later deposition, J.S. testified that she and K.L. created the profile thinking "it would be comical" because "it's outrageous," and not really for any other reason.

J.S. and K.L. initially set the MySpace profile as "public," which made it accessible by anyone who knew the URL or found it by searching MySpace for a term the profile contained. At school on Monday, March 19, 2007, the day after the profile was created, numerous friends at the Middle School approached J.S. to talk about the profile, generally saying they found it funny. J.S. testified that she made the profile "private" after school that evening, so it could be viewed only by those people whom she and K.L. invited to be "m-hoe=]'s" MySpace online friends. The two students then granted "friend" status to approximately twenty-two other students. Because the Middle School computers block access to MySpace, students could have viewed the profile only from an off-campus location. McGonigle testified that he first learned of the profile on that Monday.

On the morning of Tuesday, March 20, 2007, a student, B, approached McGonigle, informed him of the profile, and told him it contained disturbing comments about him. McGonigle asked B to try to find out who created the profile, and afterwards attempted to find the profile himself from his office computer, which did not block access to MySpace. Unable to locate the profile, McGonigle called MySpace, Inc., which told him it could not direct him to a specific profile without the URL. By Tuesday afternoon, B returned to McGonigle and advised him that J.S. had created the profile. McGonigle asked B to bring him a printout of the MySpace profile.

B brought a printed copy of the profile to McGonigle at the Middle School on the morning of Wednesday, March 21, 2007. To the best of McGonigle's knowledge, this was the only copy of the profile that entered the school. Because the printout contained the profile's URL, McGonigle apparently was able to open and view the profile directly from the MySpace website, despite the students having made it private. J.S. was absent from school on that particular day, so McGonigle was unable to discuss the profile with her at that time. McGonigle then approached Superintendent Joyce Romberger and Director of Technology Susan Schneider–Morgan. The three met for approximately ten or fifteen minutes, reviewed the profile, and concluded that it violated the School District's Acceptable Use Policy ("AUP") because it violated copyright laws in misappropriating McGonigle's photograph from the School District's website without permission. *See id.* at 39–55. Romberger and Schneider–Morgan did not discuss whether the statements in the profile were true. Although Romberger was required to report any misconduct by the principal to the Board of School Directors, she did not disclose any of the allegations in the profile because she believed it consisted of "lies" and "malicious comments" made by students angry at McGonigle.

McGonigle next showed the profile to two guidance counselors, Debra Frain (his wife) and Michelle Guers. He contacted MySpace, Inc. a second time to inquire whether he could learn the identity of the profile's creator based on the URL, and

MySpace informed him that he could not, absent a court order. By the end of Wednesday, McGonigle sought to discipline the students responsible for the profile's creation and had decided that, in making false accusations about a school staff member, the profile was a level-four infraction under the Middle School's discipline code, as contained in the 2006–2007 Student—Parent Handbook (the "Handbook"). *Id.* at 65–66. McGonigle testified that he did not believe the profile launched accusations against him, but rather that it was an imposter profile, purporting to be created by him.

On Thursday, March 22, 2007, J.S. returned to school and McGonigle called her and K.L. to his office to meet with him and Guers regarding the profile. Although J.S. initially denied creating the profile, she ultimately admitted her role. McGonigle explained to the girls that he "was very upset and very angry, hurt, and [he] c[ould]n't understand why [they] did this to [him] and [his] family," and "told them that [he] would be looking to take legal action against them and their famil[ies]." J.S. and K.L. remained in McGonigle's office while he contacted their parents and waited for both of their mothers to arrive at the school. McGonigle met with J.S. and her mother, Terry Snyder ("Snyder"), and showed her the profile. He informed them that he was punishing J.S. and K.L. with a ten-day out-of-school suspension, which prohibited attendance at school functions, and again threatened legal action against them. J.S. and Snyder apologized to McGonigle, and J.S. followed this in-person apology with a subsequent apology letter to McGonigle and Frain.

Shortly after J.S. and Snyder left his office, McGonigle called MySpace, Inc., provided it with the appropriate URL, and requested that it promptly remove the profile, which it did. McGonigle contacted

Romberger to inform her of the punishment he imposed on J.S. and K.L. and, despite her ability to overrule his disciplinary decisions, she concurred with his decision to suspend the students for ten days. Next, McGonigle contacted the police to look into a criminal action against J.S. and K.L. The local police referred him to the state police, and he invited a state police officer to the Middle School to look at the profile. The officer told McGonigle he could press criminal harassment charges, but that they would likely be dropped, and McGonigle then declined to press charges, although he did file a formal report. The officer asked McGonigle whether he wanted him to call J.S., K.L., and their parents to the police station to "let them know how serious [the situation] was." McGonigle responded in the affirmative and, on Friday, March 23, 2007, the officer summoned J.S., K.L., and their mothers to the police station to discuss the profile. The same day, McGonigle sent J.S.'s parents a disciplinary notice stating that J.S. had been suspended for ten days. The next week, Romberger denied Snyder's request to overrule the suspension, and J.S. apparently never appealed her suspension to the Board of School Directors. During the ten-day suspension, J.S.'s school assignments were brought to her home. Snyder testified that, in addition to the suspension, the Snyders punished J.S. "for a very long time" for her role in creating the profile.

Because our legal analysis turns on the interaction between the profile and the Middle School, we will detail the relevant facts regarding the effect of the profile on the school. Before the District Court, the School District argued that the profile disrupted school because (1) two teachers, Randall Nunemacher and Angela Werner, had to quiet their classes while students talked about the profile; (2) one guidance counselor had to proctor a test so another administrator could sit in on the meetings

between McGonigle, J.S., and K.L.; and (3) two students decorated J.S. and K.L.'s lockers to welcome them back upon their return to school following the suspension, and students congregated in the hallway at that time.

Specifically, Nunemacher testified that on Thursday, March 22, 2007, when McGonigle called J.S. and K.L. into his office, a group of six or seven students disrupted his second period eighth-grade Algebra class by talking about the profile and the girls' suspensions during their unstructured classroom work time and by continuing to talk after he told them several times to stop. Nunemacher quieted them nicely two or three times, and finally, after he raised his voice, the talking stopped; the entire incident lasted five or six minutes. Nunemacher also testified that he overheard at least two students talking about the profile on Wednesday, March 21, 2007, in his sixth period class. The students talked for a minute or two, and then quieted down once he asked them to stop talking. Nunemacher stated that he typically asks students to quiet down during class about once a week. In addition to these two incidents, Nunemacher reported that he heard general "rumblings" that week indicating that students were discussing the profile, but he did not yet fully understand the situation when he overheard the comments, and could not give any specific details about these rumblings.

Werner testified that during her Skills for Adolescents class, some eighth-grade girls approached her after the lesson was finished to tell her about the profile. They mentioned that they were concerned about some specific comments in the profile regarding McGonigle and his family. Additionally, Guers was scheduled to administer a makeup test on the morning McGonigle met with J.S., K.L., and their mothers, but had to sit in on the meetings

with McGonigle and the girls instead, and therefore asked Frain to supervise the testing for twenty-five to thirty minutes. Frain then had to cancel some student counseling appointments in order to do so. The students with whom Frain cancelled her meetings would have proceeded to their normal classes instead, and rescheduled these meetings with her.

McGonigle also testified that, upon J.S. and K.L.'s return from suspension, some students decorated the girls' lockers to welcome them back with "construction paper with confetti and ribbons and bows and stuff like that," and the decorations stated "congratulations." McGonigle said these locker decorations "created quite a buzz and a stir in the eighth grade hallway with about 20 to 30 students in a circle that had to be broken up by teachers." As a result, he "severely reprimanded" the two students who had decorated the lockers, and called their parents to inform them of the incident. These two students told McGonigle they had decorated the lockers to "congratulat[e J.S. and K.L.] on what they did." McGonigle stated that the students who decorated the lockers "didn't mean to hurt me, but they didn't think it was right, the fact that I suspended [J.S. and K.L.]." The students who merely congregated in the hall were not reprimanded. Finally, McGonigle testified that he noticed a severe deterioration in discipline in the Middle School, especially among the eighth graders, following the creation of the profile, his corresponding discipline of J.S. and K.L., and J.S. and the Snyders' filing of this lawsuit. He attributed this change to a new culture of students rallying against the administration. McGonigle also mentioned that he had stress-related health problems as a result of the profile and this litigation.

### B. Procedural History

J.S. and her parents filed this 42 U.S.C. § 1983 civil rights action on March 28,

2007, against the School District, Superintendent Romberger, and Principal McGonigle. They argued that the ten-day suspension violated J.S.'s First Amendment free speech rights, her due process rights, her rights under Pennsylvania state law, and her parents' Fourteenth Amendment substantive due process rights. J.S. and her parents filed a motion for a temporary restraining order and/or preliminary injunction, which the District Court denied on March 29, 2007. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, No. 3:07cv585, 2007 WL 954245 (M.D.Pa. Mar.29, 2007).

Following discovery, both parties moved for summary judgment on November 21, 2007. In January 2008, J.S. and the Snyders stipulated to the dismissal of McGonigle and Romberger as defendants in the suit. On September 11, 2008, the District Court denied summary judgment as to J.S. and the Snyders, but granted it as to the School District. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, No. 3:07cv585, 2008 WL 4279517, *9 (M.D.Pa. Sept.11, 2008). The District Court acknowledged that J.S. created the profile at home, *id.* at *1, and determined that it did not substantially and materially disrupt school so as to satisfy the *Tinker* standard, although it did cause some disruption, *id.* at *4, *7. However, the District Court ultimately held that, based on the facts of the case and "because the lewd and vulgar off-campus speech had an effect on-campus," the School District did not violate J.S.'s First Amendment rights by disciplining her. *Id.* at **7–8. The District Court rejected J.S.'s additional claims, holding that, because the School District's discipline was appropriate and J.S.'s First Amendment claim failed, her other claims must also fail. *Id.* at **8–9. J.S. and her parents filed a timely notice of appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291.

Our review of the District Court's grant of summary judgment is plenary, and we apply the same standard as the District Court. *See, e.g., Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n. 7 (3d Cir.2009); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Del. Co.*, 998 F.2d 1224, 1230 (3d Cir.1993). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [School District] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party," which, here, is J.S. *Combs v. Homer–Ctr. Sch. Dist.*, 540 F.3d 231, 235 n. 5 (3d Cir.2008) (internal quotation marks omitted).

## III.

### A. First Amendment Freedom of Speech

At issue in the instant appeal is whether the School District's punishment of J.S. for her role in creating the MySpace profile offends the free speech protections of the First Amendment. We thus begin with a brief overview of the four Supreme Court cases that provide the applicable body of law for determining when school administrators can restrict student speech although, notably, the Court has not yet spoken on the relatively new area of student internet speech. In outlining the overarching principles regarding student speech, the Court has noted that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to

freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506, 89 S.Ct. 733. Nevertheless, "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. 733.

In *Tinker*, school officials learned of some students' plans to wear black armbands to express their objection to the United States' involvement in the war in Vietnam. *Id.* at 504, 89 S.Ct. 733. In response, the officials adopted a policy that any student wearing a black armband to school would be asked to remove it and, if he refused, he would be suspended until he returned without the armband. *Id.* The Court, in response to the students' subsequent lawsuit, stated that wearing the armbands was "closely akin to 'pure speech' " entitled to First Amendment protection, *id.* at 505–06, 89 S.Ct. 733, and also noted that this action espoused a political opinion, *id.* at 510–11, 89 S.Ct. 733. Despite school officials advancing prevention of disruption as their justification for the armband policy, the Court explained that "[c]ertainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." *Id.* at 509, 89 S.Ct. 733 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)). The Court then found that the record did not contain any facts that indicated the wearing of the armbands "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, [that] no disturbances or disorders on the school premises in fact occurred," *id.* at 514, 89 S.Ct. 733, and the case did "not concern speech or action that intrudes upon the work of the schools or the rights of other students," *id.* at 508–09, 89 S.Ct. 733. Therefore, it held that the policy violated the students' First Amendment free speech rights. *Id.* at 514, 89 S.Ct. 733.

"Since *Tinker*, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir.2001). First, the Court created an exception in a case in which a high school student delivered a speech full of "pervasive sexual innuendo" in front of approximately six hundred high school students at an in-school assembly while nominating another student for a student government position. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 677–78, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Following the assembly, a school official notified the student that the school considered his speech a violation of its rule prohibiting "obscene, profane language," suspended him for three days, and removed his name from a list of candidates for student graduation speaker. *Id.* at 678, 106 S.Ct. 3159. The Court noted in its opinion that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* at 682, 106 S.Ct. 3159. Pointing out that the role of public education is to "prepare pupils for citizenship in the Republic" by "inculcat[ing] the habits and manners of civility," *id.* at 681, 106 S.Ct. 3159 (internal quotation marks omitted), the Court stated that "[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech ... would undermine the school's basic educational mission." *Id.* at 685, 106 S.Ct. 3159. It then held that, even without engaging in a substantial disruption analysis,

"it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685–86, 106 S.Ct. 3159. We have subsequently interpreted *Fraser* as establishing that "there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech in school." *Saxe,* 240 F.3d at 213; *accord Sypniewski, Jr. v. Warren Hills Reg'l Bd. of Educ.,* 307 F.3d 243, 253 (3d Cir.2002).

The Supreme Court further limited the application of the First Amendment in the context of student speech in a case involving a principal's decision to withhold two pages of a high school student-run newspaper from publication. *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 262–64, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The Court recognized that schools "are entitled to exercise greater control" over speech that appears to be school-sponsored and held that the Tinker substantial disruption standard does not apply in such a scenario. *Id.* at 270–73, 108 S.Ct. 562. Thus, school officials "do not offend the First Amendment by exercising editorial control over . . . student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.

Finally, the Supreme Court recently explored whether a principal violated a student's First Amendment rights in forcing him to take down a fourteen-foot banner, unfurled at a school-sanctioned and school-supervised event, that read "BONG HiTS 4 JESUS." *Morse v. Frederick,* 551 U.S. 393, 396–97, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). The Court found that the principal reasonably believed the banner was advocating the use of illegal drugs despite its admittedly unclear language, noted schools' important interest in deterring illegal drug use by schoolchildren, and held that "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 400–03, 407–10, 127 S.Ct. 2618.

### 1. Student Speech

In the instant appeal, J.S. argues initially that the First Amendment protects her speech, even if it was lewd and offensive pursuant to *Fraser,* because it occurred entirely outside the Middle School.[3] The First Amendment generally protects lewd, offensive, and vulgar speech outside the school context. *See Cohen v. California,* 403 U.S. 15, 16, 25–26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (holding that a state may not make the wearing of a jacket bearing the words "Fuck the Draft" a criminal offense). *But see Fraser,* 478 U.S. at 682, 106 S.Ct. 3159 (" '[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.' " (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.,* 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring))). The District Court characterized the MySpace profile as "lewd and vulgar," a finding J.S. does not dispute, and we agree fully with

---

**3.** It is well-established that J.S.'s status as a minor does not affect her First Amendment rights. *See Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), *overruled on other grounds in part by Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."); *Anspach v. City of Phila., Dep't of Pub. Health,* 503 F.3d 256, 261 (3d Cir.2007) (same).

this characterization.[4] *J.S. ex rel. Snyder*, No. 3:07cv585, 2008 WL 4279517, at *7. However, J.S. argues that the District Court erred in concluding that, because the profile was lewd and vulgar under *Fraser* and had an effect on campus, McGonigle was free to discipline her for its creation. *See id.* at **6–7. We decline today to decide whether a school official may discipline a student for her lewd, vulgar, or offensive off-campus speech that has an effect on-campus because we conclude that the profile at issue, though created off-campus, falls within the realm of student speech subject to regulation under *Tinker*.[5] Indeed, we have held previously that "[s]peech falling outside of [the narrow *Fraser* and *Kuhlmeier* exceptions] is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Saxe*, 240 F.3d at 214. Thus, we need not employ the two-step test the District Court used to determine, first, whether the speech came on-campus due to its effect on the Middle School and then, only if factor one is satisfied, whether the School District infringed on J.S.'s First Amendment rights in punishing her for creating the profile. Instead, we proceed directly to a *Tinker* inquiry.

## 2. Substantial Disruption

 Under *Tinker*, we must determine whether J.S.'s speech created a significant threat of substantial disruption in the Middle School. *Tinker* states that "conduct by the student, in class or out of it [while still under school control][6], which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 513, 89 S.Ct. 733. However, this disruption must be substantial because "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. 733. School officials may not limit student speech solely on account of a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733. Yet, school authorities need not wait until a substantial disruption actually occurs in order to curb the offending speech if they are able to "demonstrate any facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." *Id.* at 514, 89 S.Ct. 733. We have further clarified that "if a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster." *Saxe*, 240 F.3d at 212;

---

4. The District Court also stated that the profile contained "potentially illegal" speech, and both parties dispute on appeal whether the profile consisted of criminal harassment or tortious defamation under Pennsylvania law.

5. We may affirm the District Court on alternate grounds, provided that the record supports the judgment. *Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 303 (3d Cir.2008); *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 761 n. 1 (3d Cir.2004).

6. We cannot accept the Dissent's suggestion that Tinker's "in class or out of it" language is intended to only allow school discipline for those disruptions occurring on the school campus. Electronic communication allows students to cause a substantial disruption to a school's learning environment even without being physically present. We decline to say that simply because the disruption to the learning environment originates from a computer located off campus, the school should be left powerless to discipline the student.

*cf. Sypniewski,* 307 F.3d at 253–57 (holding that a school could not prohibit students from wearing a Jeff Foxworthy "Top 10 reasons you might be a Redneck Sports Fan" T-shirt under its racial harassment policy, which arose out of earlier incidents of racial hostility at the school, because school authorities failed to demonstrate that the language on the shirts bore anything more than a "mere" or "general association" with the earlier precipitating events as opposed to a "particular and concrete basis" indicating the potential for future disruption).

Our sister courts of appeals offer further support for the notion that a school may meet its burden of showing a substantial disruption through its well-founded belief that future disruption will occur. *See Doninger v. Niehoff,* 527 F.3d 41, 51 (2d Cir.2008) (characterizing as "misguided" the notion "that *Tinker* requires a showing of actual disruption to justify a restraint on student speech"); *Lowery v. Euverard,* 497 F.3d 584, 591–92, 596 (6th Cir.2007) *("Tinker* does not require school officials to wait until the horse has left the barn before closing the door.... [It] does not require certainty, only that the forecast of substantial disruption be reasonable.... [As such, s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place."); *La Vine v. Blaine Sch. Dist.,* 257 F.3d 981, 989 (9th Cir.2001) *("Tinker* does not require school officials to wait until disruption actually occurs before they may act.... [Thus, we look] to all of the circumstances confronting the school officials that might reasonably portend disruption.").

 Nevertheless, we balance this exception based on substantial disruption or invasion of the rights of others against the protected nature of off-campus student speech. *See Morse,* 551 U.S. at 405, 127 S.Ct. 2618 ("Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected."); *Fraser,* 478 U.S. at 688, 106 S.Ct. 3159 (Brennan, J., concurring) ("If respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate...."); *Saxe,* 240 F.3d at 216 n. 11 (stating that the notion that a school's policy could be applied to students' off-campus speech "would raise additional constitutional questions").

### 3. Application of Law to the Facts of the Instant Case

 The School District advances, and the District Court focused on, specific examples of *actual* disruption that occurred at the Middle School as a result of the profile, as elicited from McGonigle's, Nunemacher's, and Werner's deposition testimony. Were we examining the facts merely for evidence of a "substantial disruption of or material interference with school activities" that had already taken place, *see Tinker,* 393 U.S. at 514, 89 S.Ct. 733, we would have no trouble concluding, as the District Court did, that these incidents did not amount to a substantial disruption of the Middle School sufficient to discipline the students for their speech. The minor inconveniences associated with the profile, including McGonigle's meetings related to it, students talking in class for a few minutes, and some school officials rearranging their schedules to assist McGonigle, may have resulted in some disruption, but certainly did not rise to a substantial one. It is also difficult to separate the effects that the profile itself had on the school from the effects attributable to McGonigle's investigation of the profile

and subsequent punishment of J.S. and K.L.

However, the School District also argues that, given the immediate impact of the profile on the Middle School, absent McGonigle's quick corrective actions to curb its effect, the profile's potential to cause a substantial disruption of the school was reasonably foreseeable. It is apparent that the underlying cause for McGonigle's concern about the profile was its particularly disturbing content, not a petty desire to stifle speech critical of him, and we proceed with our analysis with this in mind. Therefore, we are sufficiently persuaded that the profile presented a reasonable possibility of a future disruption, which was preempted only by McGonigle's expeditious investigation of the profile, which secured its quick removal, and his swift punishment of its creators. We are especially concerned about the profile's blatant allusions to McGonigle engaging in sexual misconduct, such as: the profile's URL containing the phrase "kidsrockmybed"; "m-hoe=]'s" interests including "fucking in my office," "hitting on students and their parents," and "mainly watch[ing] the playboy channel on directv"; and an "About me" section in which "m-hoe=]" describes himself as a "sex addict," states "I have come to myspace so i[sic] can pervert the minds of other principal's [sic] to be just like me," and says "I love children[ ][and] sex (any kind)." (App. at 38.) J.S. and K.L. directly targeted McGonigle when they misappropriated his photograph from the School District's website by pasting it into the profile, identifying "m-hoe=]" as a principal even though the profile did not state his name, and focusing their "jokes" around "m-hoe=]'s" sexual proclivities, including activities clearly inappropriate for a Middle School principal and illegal for any adult. Moreover, the girls disseminated the profile and allowed other students in the School District's community (as well as anyone else who came across it) to access and view the profile freely initially, and subsequently allowed others to view the profile by becoming MySpace friends with "m-hoe=]."

We find it doubtful that the connection between the profile's sexual innuendo and McGonigle's role and duties as principal was lost on J.S. and K.L. or their target audience of other students of the Middle School and, in any event, it is not lost on us. The girls embarrassed, belittled, and possibly defamed McGonigle. They created the profile not as a personal, private, or anonymous expression of frustration or anger, but as a public means of humiliating McGonigle before those who knew him in the context of his role as Middle School principal. Indeed, several facts the School District elicited during depositions further support our conclusion regarding the profile's effect and its potential for future disruption: Werner testified that some eighth-grade girls approached her to express their concern about some specific comments in the profile pertaining to McGonigle and his family; B originally informed McGonigle of the profile to convey that it contained disturbing comments about him; and, most significantly, McGonigle testified that he noticed a severe deterioration in discipline in the Middle School, and particularly among the eighth graders, following the publication of the profile and the punishment of J.S. and K.L.

 Undoubtedly, students have made fun of or made distasteful jokes about school officials, free from the consequences of school punishment, either out-of-earshot or outside the school context since the advent of our modern educational system. However, due to the technological advances of the Internet, J.S. and K.L. created a profile that could be, and in fact was, viewed by at least twenty-two members of

the Middle School community within a matter of days. *Cf. Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 617–18 (5th Cir.2004) (holding that a violent drawing concealed in a student's night stand for two years, and only inadvertently taken to school by the student's brother, removed the speech from the realm of *Tinker* because it was not created on-campus or directed at campus). Students discussed the profile in-school and undoubtedly talked about it out-of-school as well. It is also reasonable to infer that some students initiated conversation about or shared the profile with their parents, or that parents overheard their children discussing the profile. We find it just as likely that students and parents inevitably would have begun to question McGonigle's demeanor and conduct at school, the scope and nature of his personal interests, and his character and fitness to occupy a position of trust with adolescent children, on account of the profile's contents.[7] We thus cannot overlook the context of the lewd and vulgar language contained in the profile, especially in light of the inherent potential of the Internet to allow rapid dissemination of information. Accordingly, J.S.'s argument for a strict application of *Tinker*, limited to the physical boundaries of school campuses, is unavailing. *See Doninger*, 527 F.3d at 48–49 (" '[T]erritoriality is not necessarily a useful concept in determining the limit of [school administrators'] authority.' " (alteration in original) (quoting *Thomas*, 607 F.2d at 1058 n. 13)). Instead, we hold that off-campus speech that causes or reasonably threatens to cause a substantial disruption of or material interference with a school need not satisfy any geographical technicality in order to be regulated pursuant to *Tinker*.[8]

The District Court also found that the profile contained "potentially illegal" speech.[9] Regardless of whether J.S.'s cre-

---

7. The Dissent contends this point is not supported by the record. Dissenting Op. at Part II.A, n. 3. It is inevitable, however, that as more students and parents learned of the MySpace profile, greater disruption to the learning environment would have taken place. There would have been greater concern with McGonigle's fitness to continue in his job. While Superintendent Romberger, who knew McGonigle, may have quickly concluded the profile was a series of lies, parents unfamiliar with McGonigle almost certainly would have raised questions about his supervision over their children. The time spent by McGonigle and other school and district administrators alleviating these concerns certainly would have been a substantial disruption to the educational mission of the school.

The dissent blames the School District's response to the MySpace profile for the disruptions that did occur at the Middle School. Whatever disruption that resulted from punishing the students who created the profile was mild compared to the substantial disruption that would have occurred when 50 or 100 students, as opposed to only 22, gained access to the profile and parents, acting out of concern for their children's safety challenged McGonigle's fitness.

8. We disagree with our dissenting colleague's assertion that under our standard a school district could punish two students "for using a vulgar remark to speak about their teacher at a private party." Dissenting Op. at Part II.B. The dissent's hypothetical could be correct had we used *Fraser*'s vulgarity test as the basis for this opinion. Because unlike the District Court we rely on *Tinker*, not *Fraser* as the basis of our opinion, there is a principled difference between the dissent's hypothetical and this case. Our opinion, reached by applying *Tinker*, only allows school discipline when there is a significant risk of substantial disruption at the school. Since we are expressly not applying *Fraser* to conduct off school grounds, there is no risk that a vulgar comment made outside the school environment will result in school discipline absent a significant risk of a substantial disruption at the school.

9. *Tinker* leaves open a further avenue for schools to regulate student speech when it "involves . . . invasion of the rights of others."

ation of the profile satisfied the elements of criminal harassment or defamation, we hold that the potential impact of the profile's language alone is enough to satisfy the *Tinker* substantial disruption test. Though student speech that is critical of school officials is protected and not something we wish to censor generally, we distinguish such speech from the profile in the instant case that contained undoubtedly offensive, potentially very damaging, and possibly illegal language, including insinuations that strike at the heart of McGonigle's fitness to serve in the capacity of a middle school principal. We simply cannot agree that a principal may not regulate student speech rising to this level of vulgarity and containing such reckless and damaging information so as to undermine the principal's authority within the school, and potentially arouse suspicions among the school community about his character.[10]

This outcome is in accord with several nonbinding cases that we find persuasive regarding circumstances under which schools can regulate students' off-campus Internet speech. *See Doninger*, 527 F.3d at 45, 48–49 (permitting a school to prevent a student from holding a class officer position because she posted a message on her public weblog that referred to school authorities as "douchebags in central office" and contained potentially misleading information about a school concert, explaining that her speech was vulgar and offensive under *Fraser*, but ultimately deciding that it was punishable under *Tinker* because it presented a risk of substantial disruption); *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 36, 39–40 (2d Cir.2007) (allowing school punishment of a student who had an online chat icon depicting a pistol firing a bullet at someone's head with the caption "Kill [the student's teacher]," because school authorities learned of the off-campus use of the icon, the icon contained threatening content, and it created a foreseeable risk of substantial disruption at school); *J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.*, 569 Pa. 638, 807 A.2d 847, 850, 865, 869 (2002) (holding that there was a "sufficient nexus" between a student's website, on which he made "derogatory, profane, offensive, and threatening" comments about his teacher and correspondingly caused her significant health problems, and the school, so as to bring the speech on-campus, where it then satisfied the applicable *Tinker* substantial disruption test).[11]

393 U.S. at 513, 89 S.Ct. 733. The United States Court of Appeals for the Eighth Circuit has "read this phrase as including only that speech [which] could result in tort liability." *Bystrom v. Fridley High Sch.*, 822 F.2d 747, 752 (8th Cir.1987) (alteration in original) (internal quotation marks omitted); *see also* 22 Pa.Code § 12.9(c)(1) ("Students have the responsibility to obey laws governing libel and obscenity and to be aware of the full meaning of their expression."). The parties vigorously dispute whether J.S.'s speech amounted to criminal harassment or tortious defamation. Because we have already determined that J.S.'s speech presented a reasonable threat of substantial disruption to the Middle School, we need not reach these arguments to resolve this appeal and thus decline to do so.

10. Contrary to the dissent's characterization, our description of the vulgarity of the MySpace page is not an indication that we are basing any part of our reasoning on *Fraser*. Dissenting Op. at Part II.A. Instead we mention vulgarity as one reason why J.S.' conduct was likely to cause a substantial disruption at the school. It is the significant risk that the conduct would cause a substantial disruption, however, not the vulgarity of the MySpace page, that serves as the basis for our opinion.

11. A separate appeal dealing with school discipline of a student who created a MySpace profile of his principal was filed simultaneously in our Court. *See Layshock v. Hermitage Sch. Dist.*, 593 F.3d 249, 2010 WL 376184 (3d Cir.2010). However, upon review of the holding in that case, as set forth in that

The dissent argues that the "profile was so outrageous that no one could have taken it seriously, and no one did" and therefore it was not reasonable for the school district to foresee a significant disruption. Dissenting Op. at Part II.A. While those who knew McGonigle may not have taken the profile seriously, as the MySpace page spread to concerned parents who may have had little interaction with McGonigle, some would have believed the principal was unfit to care for their children. The disruption that would have resulted from the meetings necessary to alleviate these parents' concerns and the strong possibility that some parents would choose to keep their children away from McGonigle and the school until they could be assured he was not a threat likens this case to the others cited where a significant likelihood of a substantial disruption was found.

The dissent attempts to distinguish these cases by arguing that J.S. "did not even intend for the speech to reach the school—in fact, she took specific steps to make the profile 'private' so that only her friends could access it." Dissenting Op. at Part II.A. Rather than showing J.S. did not intend for the speech to reach the school, the fact that she took action to allow only chosen Blue Mountain Middle School students to see the profile demonstrates that her behavior directly targeted the school. Additionally, McGonigle was able to access the profile by typing in the URL even after J.S. set the profile to private. Anyone else who learned the URL would presumably have also been able to access the profile notwithstanding the private setting.

Admittedly, no similar events involving Internet speech had occurred previously at the Middle School that might have led McGonigle to ascertain the threat of a substantial disruption based on past incidents, as occurred in *Sypniewski*. However, we find the speech in *Sypniewski* factually dissimilar from the profile at issue here because the language on the T-shirts in *Sypniewski* was not vulgar or offensive itself, but only in relation to other students' prior speech. See 307 F.3d at 254–57. Thus, the school authorities in *Sypniewski* had to demonstrate a well-founded fear of future disruption based primarily on the T-shirts' relationship to past disruptive incidents at the school. In contrast, J.S.'s speech was vulgar, lewd, and offensive on its face and McGonigle did not need to associate it with prior conduct to perceive its potential for future disruption. We therefore conclude, based on the profile's nature and its threat of substantial disruption of the Middle School, that the School District did not offend J. S.'s First Amendment free speech rights by punishing her for creating the profile.[12]

panel's opinion, we find the two cases distinguishable. Unlike the instant case, the school district in *Layshock* did not argue on appeal that there was, under *Tinker*, a nexus between the student's speech and a substantial disruption of the school environment. *Id.* at Part IV.A.1. This nexus, under *Tinker*, is the basis of our holding in the instant case. Rather, the *Layshock* panel held that the school district failed to establish that a sufficient nexus existed between the student's creation and distribution of the profile and the school district so that the district was permitted to regulate the student's conduct. *Id.* at Part IV.A.2. That panel also held, under *Fraser*, that the student's speech could not be considered "on-campus" speech just because it was targeted at the Principal and other members of the school community and it was reasonably foreseeable that school district and Principal would learn about the MySpace profile. *Id.* at Part IV.A.3.

**12.** The dissent argues that J.S. speech was protected by the First Amendment and therefore the school district was prohibited from punishing her while contending that it "do[es] not pass upon the viability of other measures the appellees could have pursued". Dissenting Op. at ¶ 2. One of the options the dissent

## B. Interference with Parental Rights

■ The Snyders argue that the School District interfered with their Fourteenth Amendment substantive due process right to direct the upbringing of their child free from government intervention. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Anspach,* 503 F.3d at 261 ("The Supreme Court has long recognized that the right of parents to care for and guide their children is a protected fundamental liberty interest."). Schools maintain authority over their students in acting in loco parentis because, "for some portions of the day, children are in the compulsory custody of state-operated school systems. In that setting, the state's power is 'custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.' " *Gruenke v. Seip,* 225 F.3d 290, 304 (3d Cir.2000) (quoting *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). We have further stated that:

> During this custodial time, in order to maintain order and the proper educational atmosphere, at times, those authorities 'may impose standards of conduct that differ from those approved of by some parents.' Where these standards collide, a court will require the State to demonstrate a compelling interest that outweighs the parental liberty

interest in raising and nurturing their child.

*Anspach,* 503 F.3d at 266 (citation omitted) (quoting Gruenke, 225 F.3d at 304).

The Snyders argue that the District Court erred in holding that if the School District did not violate J. S.'s First Amendment rights, it could not have violated the Snyders' parental rights because these are two separate constitutional rights, worthy of separate analyses. The Snyders argue specifically that the School District infringed on their rights when it reached into the family home to punish J.S.'s conduct, and the School District cannot overcome this with any compelling interest.

■ The School District, in response, notes that parental rights are not without limits or beyond regulation: "Courts have held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 182 (3d Cir.2005). We agree that the instant appeal presents such a case. Contrary to *Gruenke,* but similar to *C.N.,* we conclude here that McGonigle's suspension of J.S. did not "deprive[ ] [the Snyders] of their right to make decisions concerning their child," but that it "simply . . . complicated the making and implementation of those decisions." *C.N.,* 430 F.3d at 184. Further, we note on a practical level that the School District did not usurp the Snyders' authority to discipline their daughter, because they testified that

raises is pressing criminal charges. It is difficult to see how this speech would be protected on First Amendment grounds in the context of school discipline, but unprotected in the context of a criminal charge, particularly because "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood,* 484 U.S. at 266, 108 S.Ct. 562 (citations omitted). If this speech is protected under a weaker level of First Amendment protection for school students, then it must be protected under the more stringent First Amendment protections granted to those facing prosecution for their speech.

they also punished her "for a very long time" for creating the profile. In conclusion, we hold that McGonigle appropriately disciplined J.S. because, as discussed above, he properly determined that her creation of the profile was conduct subject to school regulation given that it violated school rules and threatened to create a substantial disruption in the school.

## C. Pennsylvania Law

██ J.S. argues that Pennsylvania law, in limiting schools' ability to regulate students' conduct, makes clear that her creation of the profile was not subject to punishment by the School District. The relevant Pennsylvania statute states:

> The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, ... regarding the conduct and deportment of all pupils attending the public schools in the district, *during such time as they are under the supervision of the board of school directors and teachers*, including the time necessarily spent in coming to and returning from school.

24 Pa. Stat. § 5–510 (emphasis added). J.S. argues that the Pennsylvania Commonwealth Court has interpreted the emphasized provision to mean that a school district may not punish a student for out-of-school conduct. *See D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs.*, 868 A.2d 28, 30–31, 35–36 (Pa.Cmwlth.2004) (holding that § 5–510 did not allow for school punishment of a student who purchased marijuana off campus, then returned to a school playground after school hours to smoke it, where he was caught by police, because he was not under the school's supervision at the time and the school board did not establish a "sufficient nexus between the incident and the Board's supervisory authority"); *Hoke v.*

*Elizabethtown Area Sch. Dist.*, 833 A.2d 304, 310–11 (Pa.Cmwlth.2003) (holding that a public school could not punish a student who, at the time of the event in question, was not enrolled in the school district). Because J.S. created the profile from her home, and was not under school supervision at that time, she argues that the School District's relevant disciplinary and computer policies do not allow for school punishment of her off-campus speech pursuant to the Middle School's statutory authority under § 5–510.

However, as the School District argues, we find *D.O.F.* and *Hoke* distinguishable from the instant appeal. J.S. was enrolled in the School District at the time she created the profile, in contrast to the facts of *Hoke*, and, as previously discussed, McGonigle punished J.S. "to prevent interference with the educational process," which the Pennsylvania Commonwealth Court has explicitly held is authorized under § 5–510. *See D.O.F.*, 868 A.2d at 36. J.S. has not cited any case law that persuades us that students in Pennsylvania have greater free speech rights under the Pennsylvania Constitution than under the U.S. Constitution. *See Saxe*, 240 F.3d at 202 n. 1. Nor do we read § 5–510 as an exhaustive description of all occasions under which school officials are statutorily authorized to punish students for infractions of school policies. Accordingly, we do not believe the statute necessarily excludes school regulation of out-of-school conduct that threatens to materially interfere with the educational process. Therefore, because the profile created the possibility of a substantial disruption of the Middle School, the School District did not exceed its statutory authority in punishing J.S. for creating it.

## D. Facial Challenge: Overbreadth and Vagueness

J.S. argues that the School District's disciplinary policy, as contained in the

Handbook, and its computer use policy, as contained in the AUP, are unconstitutionally vague and overbroad.[13] Specifically, J.S. challenges the Handbook's language that states "maintenance of order applies during those times when students are *under the direct control and supervision of the school district officials*," arguing that it fails to authorize the punishment she received for her off-campus creation of the profile. (App. at 58 (emphasis added).) In contrast, the School District argues that this clause provides a sufficient limit over the school's control of students. The AUP incorporates by reference the Handbook, *id.* at 55, through which we infer that the AUP is also subject to the Handbook's limiting language regarding the school's reach over student conduct.

 "A regulation is unconstitutional on its face on overbreadth grounds where there is a[sic] 'a likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are not before the Court.'" *Saxe*, 240 F.3d at 214 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). "To render a law unconstitutional, the overbreadth must be 'not only real but substantial in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Additionally, "a policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional." *Sypniewski*, 307 F.3d at 259 (citing *Saxe*, 240 F.3d at 215). We have also noted that, in light of the special characteristics of the school environment, "the overbreadth doctrine warrants a more hesitant application in

this setting than in other contexts," particularly with respect to student speech subject to proscription or regulation under *Tinker* due to its disruptive nature. *Id.*

 We have no trouble concluding that the Handbook is not overbroad on its face. The School District's policy is reasonably limited to allowing regulation of speech and behavior only when its students are "under the direct control and supervision of the school district officials," and *Sypniewski* expressly encourages judicial restraint in this area when the student speech presents the possibility of substantially disrupting school under *Tinker*. Further, we read the Handbook in conjunction with a Pennsylvania regulation that states: "Students shall have the right to express themselves unless the expression materially and substantially interferes with the educational process, threatens serious harm to the school or community, encourages unlawful activity or interferes with another individual's rights." 22 Pa. Code § 12.9(b). The fact that we also concluded that McGonigle did not violate J.S.'s First Amendment free speech rights in punishing her for creating the profile off-campus in light of its potential for future disruption of the school only underscores the conclusion that the Handbook's language does not present a chilling effect on free expression, nor is it unconstitutionally overbroad.

 We also reject J.S.'s vagueness argument. A regulation can be void for vagueness in either of two ways: (1) by "fail[ing] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits"; or (2) by "authoriz[ing] and even encourag[ing] arbitrary and discriminatory enforcement."

---

**13.** At oral argument, J.S.'s counsel conceded that the overbreadth argument is perhaps derivative of the other claims on appeal.

*City of Chi. v. Morales*, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *see also Sypniewski*, 307 F.3d at 266. Regarding notice, " '[i]t is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits.' " *Morales*, 527 U.S. at 56, 119 S.Ct. 1849 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). Further, overcoming vagueness " 'require[s] that a legislature establish minimal guidelines to govern . . . enforcement.' " *Id.* at 60, 119 S.Ct. 1849 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). Specific to the school context, we have noted that "courts have been less demanding of specificity than they have when assessing the constitutionality of other regulations." *Sypniewski*, 307 F.3d at 266. Accordingly, "because schools need the authority to control such a wide range of disruptive behavior, 'school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.' " *Id.* (quoting *Fraser*, 478 U.S. at 686, 106 S.Ct. 3159).

■ McGonigle testified that he believed J.S.'s conduct violated the AUP because it ran afoul of copyright laws in misappropriating his picture from the School District's website. (App. at 44.) Also, prior to punishing J. S., he concluded that the creation of the profile was a level-four disciplinary infraction according to the Handbook because it made false accusations about a school staff member. *Id.* at 65–66, 119 S.Ct. 1849. Under the Handbook, a level-four infraction is punishable by suspension or expulsion. J.S. argues that the Handbook is vague because it states that the Middle School may discipline its students only when the offending behavior occurred while the student was "under the direct control and

supervision" of school officials. Examining J.S.'s vagueness challenge for proper notice, we conclude that the Handbook and AUP provide ample information about student behavioral expectations and the consequences of breaking rules. We have stated that "school disciplinary rules will be struck down on this basis only when the vagueness is especially problematic," *Sypniewski*, 307 F.3d at 266, and we do not deem the Middle School's disciplinary rules to be "especially problematic" here. J.S. had ample notice that school policies prohibited the misappropriation of School District property in violation of copyright laws, and that the school would not tolerate false accusations against a school official. Moreover, we are not concerned here with the overregulation of off-campus student speech because the profile exhibited numerous qualities that compel us to conclude that it presented the reasonable possibility of causing a substantial disruption of the Middle School. We again reject J.S.'s arguments for a strict physical or geographical limit to a school's authority because it is simply not feasible, given the possibility of school trips, extracurricular activities or sporting events, after-hours on-campus events, and, now, the reach of Internet activity. Because the School District's students have sufficient notice of the applicable disciplinary and computer policies, and the rules are adequately precise so as to prevent school officials from arbitrarily enforcing them, we cannot agree with J.S. that they are vague. Therefore, we conclude that the Handbook and AUP policies are not unconstitutionally overbroad or vague.

## IV.

We hold that *Tinker* applies to student speech, whether on- or off-campus, that causes or threatens to cause a substantial disruption of or material interference with school or invades the rights of other mem-

bers of the school community. Therefore, because J.S.'s Internet profile featuring her principal alluded to his interest or engagement in sexually inappropriate behavior and illegal conduct, we conclude that it threatened to substantially disrupt the Middle School regardless of whether J.S.'s role in creating the profile was criminal or tortious. While we maintain great respect for students' First Amendment free speech rights, we are also cognizant that school officials are tasked with making difficult decisions and bear significant responsibility in educating our children. We conclude that the Constitution allows school officials the ability to regulate student speech where, as here, it reaches beyond mere criticism to significantly undermine a school official's authority in challenging his fitness to hold his position by means of baseless, lewd, vulgar, and offensive language. We also conclude that the School District did not violate the Snyders' Fourteenth Amendment rights to direct and control the upbringing of their child; that Pennsylvania permits school authorities to discipline students for conduct akin to J.S.'s creation of the profile; and that the Middle School's policies under which J.S. was punished were not unconstitutionally vague or overbroad. For all of these reasons, we will affirm the order of the District Court.

CHAGARES, Circuit Judge, concurring in part and dissenting in part.

J.S. was suspended from school for speech that took place outside the schoolhouse gates, during non-school hours, and that indisputably caused no substantial disruption in school. Because I believe that the School District's actions violated J.S.'s First Amendment free speech rights, I respectfully dissent from the majority's conclusion to the contrary.[14] Neither the Supreme Court nor this Court has ever allowed schools to punish students for off-campus speech that is not school-sponsored and that caused no substantial disruption at school. I would follow the logic and letter of these cases and reverse the District Court's grant of summary judgment in favor of the School District and denial of J.S.'s motion for summary judgment on her free speech claim. The majority's opposite holding significantly broadens school districts' authority over student speech; I believe that this holding vests school officials with dangerously overbroad censorship discretion.

In reaching this conclusion, I recognize the comprehensive authority of schools and school officials to prescribe and regulate conduct within schools. Nonetheless, people of all ages are entitled to the freedoms guaranteed by the First Amendment and such freedoms must be respected. I further recognize that speech such as that employed in this case—even made in jest—could damage the careers of teachers and school administrators. Aggrieved schools and school officials may well seek redress through civil lawsuits and perhaps even by pressing criminal charges. I conclude only that the punitive action taken by the School District in this case violated the First Amendment rights of J.S. I do not pass upon the viability of other measures the appellees could have pursued.

I.

J.S., an Honor Roll eighth grade student, was punished for creating a fake

14. I agree with my colleagues' conclusion that the School District's policies were not overbroad or void-for-vagueness, and that the District Court correctly determined that the School District did not violate the Snyders' Fourteenth Amendment substantive due process rights. As discussed infra note 11, however, I disagree with my colleagues that 24 Pa. Cons.Stat. § 5–510 did not bar the School District from punishing J.S. for her off-campus speech.

profile of her middle school principal, James McGonigle, which she and her friend, K.L., posted on MySpace, a social networking website. J.S. and K.L. created the profile on Sunday, March 18, 2007, from J. S.'s house, using a computer belonging to J.S.'s parents. The profile did not identify McGonigle by name, school, or location, though it did contain his official photograph from the School District's website. J.S. testified that she intended the profile to be a joke between herself and her friends. Appendix ("App.") 190.

The profile contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and personal attacks aimed at the principal and his family. Particularly disturbing were the profile's references to pedophilia. However, the record indicates that the profile was so outrageous that no one took its content seriously. In fact, McGonigle himself acknowledged that he believed the students "weren't accusing me. They were pretending they were me." App. 327. Moreover, McGonigle showed the profile to Superintendent Joyce Romberger, who was required to report any suspected misconduct by the school principal to the Board of School Directors. As the majority acknowledges, however, Romberger took no such action "because she believed [the profile] consisted of 'lies' and 'malicious comments' made by students angry at McGonigle." Majority Op. 292.

Initially, the profile could be viewed in full by anyone who knew the URL or who otherwise found the profile by searching MySpace for a term it contained. The following day, however, J.S. made the profile "private" after several students approached her at school, generally to say that they thought the profile was funny. App. 194. By making the profile "private," J.S. limited access to the profile to people whom she and K.L. invited to be a MySpace "friend." J.S. and K.L. granted "friend" status to about twenty-two Blue Mountain School District students.

Notably, the School District's computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from school. Moreover, as the majority acknowledges, the only printout of the profile that was ever brought to school was one brought at McGonigle's specific request. Majority Op. 292. McGonigle then used the URL on the printout to view the profile from his office computer, which did not block access to MySpace.

After meeting with J.S., K.L., and their parents, and informing them that the children would receive a ten-day out-of school suspension for creating the profile, McGonigle also contacted the police and asked about the possibility of pressing criminal charges against the students. The local police referred McGonigle to the state police, who informed him that he could press harassment charges, but that the charges would likely be dropped. McGonigle chose not to press charges, and instead completed a formal report and asked the police to speak to the students to let them know how serious the situation was.

In an attempt to justify punishment, the School District asserts that the profile disrupted school. As the majority concedes, the School District only points to three instances of alleged "disruptions":

(1) two teachers, Randall Nunemacher and Angela Werner, had to quiet their classes while students talked about the profile; (2) one guidance counselor had to proctor a test so another administrator could sit in on the meetings between McGonigle, J.S., and K.L.; and (3) two students decorated J.S. and K.L.'s lockers to welcome them back upon their return to school following the suspen-

sion, and students congregated in the hallway at that time.

Majority Op. 293–94. Notably, Nunemacher acknowledged that the talking in class was not a unique occurrence, and admitted that he had to tell his students to stop talking about various topics approximately once a week. Similarly, Werner stated that the incident she was involved in did not disrupt class because the students spoke to her during the portion of the class when students were permitted to work independently. The substitution of a guidance counselor to proctor a test also did not cause any major inconveniences in school because the meetings only lasted about twenty-five to thirty minutes, and the student counseling appointments that had to be cancelled during that time were all rescheduled.

The majority also notes that McGonigle testified that when J.S. and K.L. returned from suspension, some students decorated the girls' lockers to welcome them back to school, which created "a buzz and a stir" in the hallway. McGonigle punished the two students who decorated the lockers. The majority also emphasizes McGonigle's testimony that he "noticed a severe deterioration in discipline in the Middle School … following the creation of the profile, his corresponding discipline of J.S. and K.L., and … this lawsuit," and that "he had stress-related health problems as a result of the profile and this litigation." Majority Op. 294. I believe that this testimony is irrelevant to the issues before this Court because these disruptions did not arise out of the creation of the profile itself, but rather, were the direct result of the School District's response to the profile and the ensuing litigation. This testimony, therefore, is not relevant to determining the level of disruption that *the profile* caused in the school.

After analyzing the above facts, the District Court granted the School District's summary judgment motion on all claims, though specifically acknowledging that *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), does not govern this case because no "substantial and material disruption" occurred. App. 10–12 (refusing to rely on *Tinker*); App. 17 (concluding that "a substantial disruption so as to fall under *Tinker* did not occur"). Instead, the District Court drew a distinction between political speech at issue in *Tinker*, and "vulgar and offensive" speech at issue in a subsequent school speech case, *Bethel School District v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). App. 11–12. The District Court also noted the Supreme Court's most recent school speech decision, *Morse v. Frederick*, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), where the Court allowed a school district to prohibit a banner promoting illegal drug use at a school-sponsored event.

Applying a variation of the *Fraser* and *Morse* standard, the District Court held that "as vulgar, lewd, and potentially illegal speech that had an effect on campus, we find that the school did not violate the plaintiff's rights in punishing her for it even though it arguably did not cause a substantial disruption of the school." App. 15–16. The Court asserted that the facts of this case established a connection between off-campus action and on-campus effect, and thus justified punishment, because: (1) the website was about the school's principal; (2) the intended audience was the student body; (3) a paper copy was brought into the school and the website was discussed in school; (4) the picture on the profile was appropriated from the School District's website; (5) J.S. created the profile out of anger at the principal for disciplining her for dress code

violations in the past; (6) J.S. lied in school to the principal about creating the profile; (7) *"although a substantial disruption so as to fall under Tinker did not occur ...* there was in fact some disruption during school hours"; and (8) the profile was viewed at least by the principal at school. App. 17 (emphasis added).

The District Court then rejected several other district court decisions where the courts did not allow school punishment of speech that occurred off campus, including the decision in *Layshock v. Hermitage School District,* 496 F.Supp.2d 587 (W.D.Pa.2007), aff'd, Nos. 07–4465, 07–4555, 2010 WL 376184 (3d Cir. Feb. 4, 2010), a case substantially similar to the one before us today. *See* App. 17–20. In distinguishing these cases, the District Court made several qualitative judgments about the speech involved in each of the cases. *See, e.g.,* App. 18 (asserting that the statements in *Flaherty v. Keystone Oaks School District,* 247 F.Supp.2d 698 (W.D.Pa.2003), were "rather innocuous compared to the offensive and vulgar statements made by J.S. in the present case"); App. 19 (contending that "[t]he speech in the instant case ... is distinguishable" from the speech in *Killion v. Franklin Regional School District,* 136 F.Supp.2d 446 (W.D.Pa.2001), because of, inter alia, "the level of vulgarity that was present" in the instant case); App. 20 (claiming that as compared to *Layshock,* "the facts of our case include a much more vulgar and offensive profile").

Ultimately, the District Court held that although J.S.'s profile did not cause a "substantial and material" disruption under *Tinker,* the School District's punishment was constitutionally permissible because the profile was "vulgar and offensive" under *Fraser* and J.S.'s off-campus conduct had an "effect" at the school. In a footnote, the District Court

also noted that "the protections provided under *Tinker* do not apply to speech that invades the rights of others." App. 16 n. 5 (citing *Tinker,* 393 U.S. at 513, 89 S.Ct. 733).

## II.

Although the precise issue before this Court is one of first impression, the Supreme Court and this Court have analyzed the extent to which school officials can regulate student speech in several thorough opinions, all of which compel the conclusion that the School District violated J.S.'s First Amendment free speech rights when it suspended her for speech that took place outside the school, during non-school hours, and that caused no substantial disruption in school.

Unquestionably, the First Amendment protects the free speech rights of students in school. *Morse,* 551 U.S. at 396, 127 S.Ct. 2618 ("Our cases make clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" (quoting *Tinker,* 393 U.S. at 506, 89 S.Ct. 733)). The exercise of First Amendment rights in school, however, has to be "applied in light of the special characteristics of the school environment," *Tinker,* 393 U.S. at 506, 89 S.Ct. 733, and thus the constitutional rights of students in public schools "are not automatically coextensive with the rights of adults in other settings," *Fraser,* 478 U.S. at 682, 106 S.Ct. 3159. Since *Tinker,* courts have struggled to strike a balance between safeguarding students' First Amendment rights and protecting the authority of school administrators to maintain an appropriate learning environment.

The Supreme Court established a basic framework for student free speech claims in *Tinker,* holding that "to justify prohibition of a particular expression of opinion," school officials must demonstrate that "the

forbidden conduct would *materially and substantially interfere* with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733 (quotation marks and citation omitted) (emphasis added). This burden cannot be met if school officials are driven by "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* Moreover, "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir.2001). Although *Tinker* dealt with political speech, the opinion has never been confined to such speech. Cf. *Id.* at 215–17 (holding that the school's anti-harassment policy was overbroad because it "appears to cover substantially more speech than could be prohibited under *Tinker*'s substantial disruption test"). *See also Killion*, 136 F.Supp.2d at 455–58 (holding that the school overstepped its constitutional bounds under Tinker when it suspended a student for making "lewd" comments about the school's athletic director in an e-mail the student wrote at home and circulated to the non-school e-mail accounts of several classmates).

As this Court emphasized, with then-Judge Alito writing for the majority, *Tinker* sets the general rule for regulating school speech, and that rule is subject to several *narrow* exceptions. *Saxe*, 240 F.3d at 212 ("Since *Tinker*, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption."). The first exception is set out in *Fraser*, which we interpreted as prohibiting " 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech *in school.*" *Id.* at 213 (emphasis added); *see also Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 253 (3d Cir.2002) (quoting Saxe's

narrow interpretation of the *Fraser* exception). The second exception to *Tinker* is articulated in *Hazelwood School District v. Kuhlmeier*, which allows school officials to "regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern." *Saxe*, 240 F.3d at 214 (citing *Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)).

The Supreme Court recently articulated a third exception to *Tinker*'s general rule in *Morse*. Although, prior to the instant case, we have not had an opportunity to analyze the scope of the *Morse* exception, the Supreme Court itself emphasized the narrow reach of its decision. In *Morse*, a school punished a student for unfurling, at a school-sponsored event, a large banner containing a message that could reasonably be interpreted as promoting illegal drug use. 551 U.S. at 396, 127 S.Ct. 2618. The Court emphasized that *Morse* was a school speech case, noting that "[t]he event occurred during normal school hours," was sanctioned by the school "as an approved social event or school trip," was supervised by teachers and administrators from the school, and involved performances by the school band and cheerleaders. *Id.* at 400–01, 127 S.Ct. 2618 (quotation marks and citation omitted). The Court then held that "[t]he 'special characteristics of the school environment,' *Tinker*, 393 U.S.[ ] at 506[ ], and the governmental interest in stopping student drug abuse ... allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." *Id.* at 408, 127 S.Ct. 2618.

Notably, Justice Alito's concurrence in *Morse* further emphasizes the narrowness of the Court's holding, stressing that *Morse* "stand[s] at the far reaches of what the First Amendment permits." 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concur-

ring). In fact, Justice Alito only joined the Court's opinion "on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions," or restrictions outside of those recognized by the Court in *Tinker, Fraser, Kuhlmeier,* and *Morse. Id.* at 423, 127 S.Ct. 2618. Justice Alito also noted that the *Morse* decision "does not endorse the broad argument ... that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.' This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs." *Id.* at 423, 127 S.Ct. 2618 (citations omitted). Moreover, Justice Alito engaged in a detailed discussion distinguishing the role of school authorities from the role of parents, and the school context from the "[o]utside of school" context. *Id.* at 424–25, 127 S.Ct. 2618.

Here, the majority declines to decide whether the School District could have punished J.S.'s speech under the Fraser standard, Majority Op. 298, but concludes that the School District did not violate J.S.'s First Amendment rights because "school authorities could reasonably have forecasted a substantial disruption of or material interference with the school as a result of the MySpace profile, as defined by Tinker," *Id.* 290. Because I do not believe that either Tinker or Fraser justifies the School District's actions in this case, I dissent.

## A.

I believe that the District Court correctly concluded that the School District's sus-

pension of J.S. was unlawful under Tinker. There is no dispute that J.S.'s speech did not cause a substantial disruption in the school. The School District's counsel conceded this point at oral argument, the District Court explicitly found that "a substantial disruption so as to fall under Tinker did not occur," App. at 17, and the majority has "no trouble concluding ... that [the specific examples of actual disruption that the School District points to] did not amount to a substantial disruption of the Middle School sufficient to discipline the students for their speech," Majority Op. 299. Yet, the majority attempts to overcome this considerable hurdle by adopting the standard put forth by several of our sister courts of appeals, which allows schools to meet the Tinker test by showing that a substantial disruption was "reasonably foreseeable." *Id.* 299 (citing *Doninger v. Niehoff,* 527 F.3d 41, 51 (2d Cir.2008) (holding that Tinker does not require "actual disruption to justify a restraint on student speech")); *Lowery v. Euverard,* 497 F.3d 584, 591–92, 596 (6th Cir.2007) ("Tinker does not require school officials to wait until the horse has left the barn before closing the door.... [It] does not require certainty, only that the forecast of substantial disruption be reasonable."); *LaVine v. Blaine Sch. Dist.,* 257 F.3d 981, 989 (9th Cir.2001) ("Tinker does not require school officials to wait until disruption actually occurs before they may act.").

I assume, without expressing an opinion, that the "foreseeability" standard is consistent with Tinker;[15] nevertheless, I believe

---

**15.** The question of whether *Tinker*'s "substantial disruption" standard applies to off-campus speech in the first place is not settled. I submit that the majority of the courts answered this question in the affirmative, often citing the following passage in *Tinker:* "conduct by the student, *in class or out of it,* which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guaran-

that to justify the School District's punishment of J.S. under this test is contrary to Tinker itself. I also believe that the cases on which the majority relies are distinguishable from the instant case. Ultimately, I submit that the facts here do not support the conclusion that a forecast of substantial disruption was reasonable, and I respectfully disagree with my colleagues' conclusion to the contrary.

In Tinker, the Supreme Court held that "our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands [to protest the Vietnam War] would substantially interfere with the work of the school or impinge upon the rights of other students." 393 U.S. at 509, 89 S.Ct. 733. Given this holding, it is important to consider the record before the Supreme Court in Tinker and compare it to the facts of this case. The relevant events in Tinker took place in December 1965, the year that over 200,000 U.S. troops were deployed to Vietnam as part of Operation Rolling Thunder. Justice Black dissented in Tinker noting that "members of this Court, like all other citizens, know, without being told, that the disputes over the wisdom of the Vietnam war have disrupted and divided this country as few other issues ever have." *Id.* at 524, 89 S.Ct. 733 (Black, J., dissenting). In fact, the Tinker majority itself noted the school authorities' concern about the effect of the protest on friends of a student who was killed in Vietnam. *See id.* at 509 n. 3, 89 S.Ct. 733. Justice Black also emphasized the following portions of the record:

> the [ ] armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone. There is also evidence that a teacher of mathematics had his lesson period practically 'wrecked' chiefly by disputes with [a protesting student] who wore her armband for her 'demonstration.'

*Id.* at 517–18, 89 S.Ct. 733 (Black, J., dissenting). Based on these facts, Justice Black disagreed with the *Tinker* majority's holding that the armbands did not cause a

---

tee of freedom of speech." 393 U.S. at 513, 89 S.Ct. 733 (emphasis added). I note, however, that the phrase "in class or out of it" does not necessarily indicate the Supreme Court's approval of the application of *Tinker* to restrict speech that takes place off-campus and that is not sponsored by the school. Instead, it appears that *Tinker* was referring to *on-campus* student speech that occurs outside of the actual classroom, like Fraser's speech at a student assembly. *See id.* at 514, 89 S.Ct. 733 (concluding that "the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with *school activities,* and no disturbance or disorders *on the school premises* in fact occurred," even though the students "caused discussion *outside of the classrooms*" (emphasis added)).

Interestingly, the majority appears to concede that *Tinker's* reference to "out of class" speech only encompasses speech that occurs when a student is "still under school control." Majority Op. 298. Here, conversely, J.S. was not under "school control" when she created the profile on her parents' computer on a Sunday. Moreover, in Saxe, this Court emphasized the importance of "geographical and contextual limitations" in confining school districts' authority over student speech. *Saxe,* 240 F.3d at 216 & n. 11 (concluding that the school's anti-harassment policy was constitutionally overbroad because, *inter alia,* "the Policy does not contain any geographical or contextual limitations" and could "even be read to cover conduct occurring outside the school premises .... [which] would raise additional constitutional questions"). I do not believe we have to answer the difficult question of whether J.S.'s speech constitutes school speech to hold that the School District violated her First Amendment rights in this case.

substantial disruption in school: "I think the record overwhelmingly shows that the armbands did exactly what the elected school officials and principals foresaw they would, that is, took the students' minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war." *Id.* at 518, 89 S.Ct. 733; *see also id.* at 524, 89 S.Ct. 733 ("Of course students, like other people, cannot concentrate on lesser issues when black armbands are being ostentatiously displayed in their presence to call attention to the wounded and dead of the war, some of the wounded and the dead being their friends and neighbors.").

This was the record in *Tinker,* and yet the majority in that case held that "the record does not demonstrate *any facts* which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," and thus that the school violated the students' First Amendment rights. *Id.* at 514, 89 S.Ct. 733 (emphasis added). Now I turn to our record. J.S. created the profile as a joke, and she took steps to make it "private" so that access was limited to her and her friends. Although the profile contained McGonigle's picture from the school's website, the profile did not identify him by name, school, or location. Moreover, the profile, though indisputably vulgar, was so juvenile and nonsensical

that no reasonable person could take its content seriously,[16] and the record clearly demonstrates that no one did. *See, e.g.,* App. 327 (demonstrating that McGonigle recognized that the students "weren't accusing me"); Majority Op. 292 (acknowledging that Romberger had a duty to report suspected misconduct, but that she believed the profile was full of "lies and malicious comments" (quotation marks omitted)). Also, the School District's computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from school. And, the only printout of the profile that was ever brought to school was one that was brought at McGonigle's express request. Thus, beyond general rumblings, a few minutes of talking in class, and some officials rearranging their schedules to assist McGonigle in dealing with the profile, no disruptions occurred.[17]

My colleagues acknowledge that the "actual disruption[s]" that the School District points to are no more than "minor inconveniences." Majority Op. 299. They also concede that it is "difficult to separate the effects that the profile itself had on the school from the effects attributable to McGonigle's investigation of the profile and subsequent punishment of J.S. and K.L." *Id.* 299–300. Yet the majority concludes that a substantial disruption was reasonably foreseeable, given the content

**16.** I reject the majority's assertion that "students and parents inevitably would have begun to question McGonigle's demeanor and conduct at school, the scope and nature of his personal interests, and his character and fitness to occupy a position of trust with adolescent children, on account of the profile's contents." Majority Op. 301 (emphasis added). This contention is simply not supported by the record.

**17.** My colleagues also emphasize that McGonigle "noticed a severe deterioration in discipline in the Middle School ... following the

publication of the profile and the punishment of J.S. and K.L." Majority Op. 300. The facts that McGonigle cites to support this proposition, *see supra,* p. 290, demonstrate that these disruptions were not ones that arose out of the creation of the profile itself, but rather, were the direct result of the School District's response to the profile and the ensuing litigation. As set forth earlier, I do not believe that the deterioration in discipline that followed McGonigle's punishment of J.S. and K.L. is relevant to determining the level of disruption that *the profile* caused, or could reasonably have been expected to cause, in the school.

of J.S.'s speech. I disagree. In comparing our record to the record in *Tinker*, I do not believe that this Court can apply *Tinker*'s holding to justify the School District's actions in this case. As my colleagues acknowledge, an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508, 89 S.Ct. 733. If Tinker's black armbands—an ostentatious reminder of the highly emotional and controversial subject of the Vietnam war—could not "reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," *id.* at 514, 89 S.Ct. 733, neither can J.S.'s profile, despite the unfortunate humiliation it caused for McGonigle.

Moreover, I believe that a comparison of our record to that of Tinker demonstrates that to apply the foreseeability standard adopted by our sister courts of appeals in a principled manner, courts need to define "foreseeability" in a way that is harmonious with Tinker. That is, courts must determine when an "undifferentiated fear or apprehension of disturbance" transforms into a reasonable forecast that a substantial disruption or material interference will occur. The majority cites several cases where courts held that a forecast of substantial and material disruption was reasonably foreseeable. *See, e.g., Doninger*, 527 F.3d at 50–51 (holding that punishment was justified, under *Tinker*, where a student's derogatory blog about the school was "purposely designed by [the student] to come onto the campus," to "encourage others to contact the administration," and where the blog contained "at best misleading and at worst false information" that the school "need[ed] to correct" (quotation marks and alteration omitted)); *Lowery*, 497 F.3d at 596 (holding that punishment was justified, under *Tinker*, where students circulated a petition to fellow football players calling for the ouster of their football coach, causing the school to have to call a team meeting to ensure "team unity," and where not doing so "would have been a grave disservice to the other players on the team"); *LaVine*, 257 F.3d at 984, 989–90 (holding that the school district did not violate a student's First Amendment rights when it expelled him on an emergency basis "to prevent [ ] potential violence on campus" after he showed a poem entitled "Last Words" to his English teacher, which was "filled with imagery of violent death and suicide" and could "be interpreted as a portent of future violence, of the shooting of [ ] fellow students").

The majority likens this case to the above cases by contending that the profile was accusatory and capable of "arous[ing] suspicions among the school community about [McGonigle's] character" because of the "profile's blatant allusions to McGonigle engaging in sexual misconduct." Majority Op. 300, 302. As explained above, however, this contention is simply not supported by the record. The profile was so outrageous that no one could have taken it seriously, and no one did. Thus, it was clearly not reasonably foreseeable that J.S.'s speech would create a substantial disruption or material interference in school, and this case is therefore distinguishable from the student speech at issue in *Doninger, Lowery*, and *LaVine*.

Moreover, unlike the students in *Doninger, Lowery*, and *LaVine*, J.S. did not even intend for the speech to reach the school—in fact, she took specific steps to make the profile "private" so that only her friends could access it. The fact that her friends happen to be Blue Mountain Middle School students is not surprising, and does not mean that J.S.'s speech targeted the school. Finally, the majority's suggestion that "absent McGonigle's quick corrective actions to curb [the profile's] ef-

fect," a substantial disruption would occur, Majority Op. 24, is directly undermined by the record. If anything, McGonigle's response to the profile *exacerbated* rather than contained the disruption in the school. *See id.* (admitting that it is "difficult to separate the effects that the profile itself had on the school from the effects attributable to McGonigle's investigation of the profile and subsequent punishment of J.S. and K.L.").

Finally, I am particularly troubled by the majority's "hold[ing] that the potential impact of the profile's language alone is enough to satisfy the *Tinker* substantial disruption test." Majority Op. 302. This statement is disconcerting because it sounds like an application of the *Fraser* standard rather than the *Tinker* standard. Specifically, the majority appears to be more concerned with the level of vulgarity of J.S.'s speech, than its potential impact. *See id.* ("We simply cannot agree that a principal may not regulate student speech rising to *this level of vulgarity* ...." (emphasis added)).[18] In light of the facts of this case—and, specifically, the fact that the profile was so outrageous that no one could have taken it seriously—to focus on the vulgarity of the language is to allow the *Fraser* exception to swallow the *Tinker* rule.

The facts simply do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school as a result of J.S.'s profile. Under *Tinker,* therefore, the School District violated J.S.'s First Amendment free speech rights when it suspended her for creating the profile.

B.

Because Tinker does not justify the School District's suspension of J.S., the only way for the punishment to pass constitutional muster is if we accept the School District's argument—and the District Court's holding—that J.S.'s speech can be prohibited under the Fraser exception to Tinker.[19] The majority notes that the exceptions to Tinker are "narrow," and yet it "decline[s][ ] to decide whether a school official may discipline a student for her lewd, vulgar, or offensive off-campus speech that has an effect on-campus" under Fraser. Majority Op. 298. I submit that this question has already been decided by the Supreme Court—Fraser does not apply to off-campus speech. Specifically in *Morse,* Chief Justice Roberts, writing for the majority, emphasized that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 405, 127 S.Ct. 2618 (citing Cohen).[20] The

---

**18.** To draw distinctions based on "levels of vulgarity" is generally antithetical to the First Amendment. *See Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (noting "one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style largely to the individual."); *see also Morse,* 551 U.S. at 409, 127 S.Ct. 2618 (declining to extend *Fraser* to cover all speech deemed "offensive" and noting that "much political and religious speech might be perceived as offensive to some.").

**19.** Indisputably, neither *Kuhlmeier* nor *Morse* governs this case.

**20.** Notably, in *Morse,* Chief Justice Roberts also cited Justice Brennan's concurrence in *Fraser,* which noted, "[i]f respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate." *Fraser,* 478 U.S. at 688, 106 S.Ct. 3159 (Brennan, J., concurring) (citing *Cohen).*

Court's citation to the Cohen decision is noteworthy. The Supreme Court in *Cohen* held that a state may not make a "single four-letter expletive a criminal offense." 403 U.S. at 26, 91 S.Ct. 1780. Accordingly, Chief Justice Roberts's reliance on the Cohen decision reaffirms that a student's free speech rights outside the school context are coextensive with the rights of an adult, such as Cohen.

Thus, under the Supreme Court's precedent, the *Fraser* exception to *Tinker* does not apply here. In other words, *Fraser's* "lewdness" standard cannot be extended to justify a school's punishment of J.S. for use of profane language outside the school, during non-school hours.[21]

The fact that McGonigle caused a copy of the profile to be brought to school does not transform J.S.'s off-campus speech into school speech. The flaws of a contrary rule can be illustrated by extrapolating from the facts of *Fraser* itself. As discussed above, the Supreme Court emphasized that Fraser's speech would have been protected had he delivered it outside the school. Presumably, this protection would not be lifted if a school official or Fraser's fellow classmate overheard the off-campus speech, recorded it, and played it to the school principal.[22] Similarly here, the fact that another student printed J.S.'s profile at the express request of McGonigle does not turn J.S.'s off-campus speech into on-campus speech.

Under these circumstances, to apply the *Fraser* standard to justify the School District's punishment of J.S.'s speech is to adopt a rule that allows school officials to punish any speech by a student that takes place anywhere, at any time, as long as it is *about* the school or a school official, is brought to the attention of a school official, and is deemed "offensive" by the prevailing authority. Under this standard, two students can be punished for using a vulgar remark to speak about their teacher at a private party, if another student overhears the remark, reports it to the school authorities, and the school authorities find the remark "offensive." There is no principled way to distinguish this hypothetical from the facts of the instant case.

Accordingly, I conclude that the *Fraser* decision did not give the School District the authority to punish J.S. for her off-campus speech.[23]

---

**21.** The School District notes that the courts in Doninger and Bethlehem Area School District suggested that Fraser applies to vulgar off-campus speech. *See Doninger*, 527 F.3d at 49 ("It is not clear ... [whether] Fraser applies to off-campus speech."); *Bethlehem Area Sch. Dist.*, 807 A.2d at 867 ("[W]e are not convinced that reliance solely on Tinker is appropriate."). These cases are not only not binding on this Court, but also both Doninger and Bethlehem Area School District ultimately relied on Tinker, not Fraser, in upholding school censorship. Thus, the courts' suggestion that the Fraser standard may apply to off-campus speech is dicta. Most importantly, that dicta is undermined directly by Chief Justice Roberts's statement in Morse: "Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 405, 127 S.Ct. 2618 (citing *Cohen*, 403 U.S. at 15, 91

S.Ct. 1780). The most logical reading of Chief Justice Roberts's statement prevents the application of Fraser to speech that takes place off-campus, during non-school hours, and that is in no way sponsored by the school.

**22.** Note that the question of whether a school has the authority to punish a student who brings vulgar speech into school is separate from whether the school can punish the source of that speech.

**23.** I disagree with the majority's holding that 24 Pa. Cons.Stat. § 5–510 did not bar the School District from punishing J.S. for her off-campus speech. Section 5–510 limited the authority of the School District to:

> adopt and enforce such reasonable rules and regulations ... regarding the conduct and deportment of all pupils attending the

## III.

For the foregoing reasons, I would reverse the District Court's judgment and grant summary judgment to J.S. on her First Amendment free-speech claim.

public schools in the district, *during such time as they are under the supervision of the board of school directors and teachers, including the time necessary spent in coming to and returning from school.* *Id.* (emphasis added). The Pennsylvania Commonwealth Court has interpreted this provision to prohibit a school district from punishing students for conduct occurring outside of school hours—even if such conduct occurs on school property. *See D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs.*, 868 A.2d 28 (Pa.Cmwlth.2004).

All of the integral events in this case occurred outside the school, during non-school hours. Accordingly, I believe that § 5–510 barred the School District from punishing J.S.